(No. 34807.—)

DEAN J. MILANI *et al.,* Appellees, *vs.* MARION ELLEN PROESEL, *et al.,* Appellants.

*Opinion filed November 26, 1958—Rehearing denied Jan. 22, 1959.*

FRANK J. DELANY, of Chicago, for appellants.

MOSES, BACHRACH AND KENNEDY, of Chicago, (WIL-LIAM C. WINES, STANLEY J. MORRIS, and MORRIS SOLO-MON, of counsel,) for appellees.

Mr. JUSTICE BRISTOW delivered the opinion of the court:

This is a direct appeal by defendant Marion Proesel from a decree of the superior court of Cook County approving the master's findings and ordering said defendant to specifically perform a contract for the sale of certain land owned by her to plaintiffs Dean J. Milani and First National Bank of Lake Forest.

Although the complaint originally sought only recovery of some $6,500 earnest money deposited by plaintiff Milani with defendant Ernest Dettmar as broker, the amended complaint requests specific enforcement of an alleged contract against defendant Proesel, or, alternatively, damages for its breach. Therefore, the essential inquiry on this appeal is whether the facts and circumstances establish the existence of a valid contract which should be specifically performed.

From the record it appears that on August 6, 1954, Lawrence Proesel, father of defendant Marion Proesel, gave Dettmar, as broker, a nonexclusive listing of certain real estate in which he owned an undivided ⅔ interest, and his brother-in-law owned the remaining third. In the listing Proesel promised Dettmar a commission for his services in securing a purchaser. The property, a two-block area of vacant land in the village of Lincolnwood, was described as running east from the southeast corner of Crawford and Pratt avenues to East Prairie Avenue ("50 x 165 Not In"), and was priced at $200 per front foot commercially

zoned and $100 per front foot ranch-house frontage, which amounted to between $80,000 and $85,000. Lawrence Proesel also delivered a handwritten diagram of the parcel to the broker, on which a 50-foot portion was encircled by someone with the word "out."

Dettmar erected a metal sign on the premises advertising it for sale. In the latter part of 1954, plaintiff Milani contacted Dettmar, and on January 4, 1955, at Milani's direction, Dettmar filled in a form real-estate contract to be submitted to Lawrence Proesel, in which the designated purchaser was "First National Bank of Lake Forest, as Trustee," and the seller was "Lawrence Proesel et al." The document was not signed by anyone, but bore only the typed name of "First National Bank of Lake Forest" in the space provided for the signature of the parties, and the initials of Dean J. Milani near the line on which the Bank's name was typed. Milani's initials also appear in two other places where there are pen-and-ink changes on the form contract.

In connection with the signing, Milani testified that he has never asked the bank to sign; nor did he sign his initials as an officer of the bank; nor is there any evidence of any action by the bank authorizing Milani to bind it, other than Milani's statement that he had signed the bank's name in connection with other trusts. At the time this form was filled in, however, Milani did not know in which trust he wanted the property to be placed, and told Dettmar that a trust would be assigned as the deal progressed.

The form recited an earnest money deposit of $2,000 and provided for payment of an additional $28,000 within 90 days for the east half of the property. It then gave the purchaser an option to buy the west half for $35,000, of which $5,000 had to be paid within 90 days, and the balance was payable within one year. It further provided that upon acceptance by the sellers the earnest money was to be increased by the payment of $4,500 additional before

March 15, 1955, with payments to be altered accordingly.

Dettmar submitted this document to Lawrence Proesel, and in his presence made notations on the back of the document as to the amounts involved. They calculated that, after payment of delinquent taxes, special assessments and costs of sale, the deal would net about $20,000 out of the total of $65,000. Dettmar testified that he did not ask Lawrence Proesel to sign the document, and that he told Milani that Lawrence Proesel never signed contracts, but that his word was his bond.

On January 10, 1955, six days after the date indicated on the document, Lawrence Proesel died. Inasmuch as plaintiff Milani seeks specific performance on the theory that Lawrence Proesel's daughter, as executrix, adopted this form contract by her letters and conduct, and became bound thereby, it is incumbent upon this court to review in detail the chronology of the ensuing events.

Upon learning of her father's death, defendant Marion Proesel returned immediately to Chicago from Washington, D. C., where she worked in the U. S. Department of Health, Education and Welfare. On January 12, 1955, she met Dettmar, the broker, for the first time, when he appeared at the family home. At that time he merely advised her of the prospect of a sale of her father's property for $65,000, and she explained that she was interested in disposing of it since her father left no personal estate for the payment of necessary expenses. When they met again some 10 or 12 days later in the family home, defendant Marion Proesel told Dettmar that she was interested in selling the property for $65,000, but that her father wanted her sister Catherine to have some 50 feet of that property. Dettmar named Milani as a prospective purchaser, and told defendant Proesel some facts about him, including his owning property in Lake Forest. It was agreed that Dettmar should be paid a commission on any sale, but the exact amount was not mentioned.

Defendant Proesel returned to Washington the latter part of January, 1955, and the following month wrote Dettmar the first of three material letters. She advised him that the sale of the property had been entrusted to her by her aunt and uncle, that she was very much interested in liquidating the East Prairie property, and she further stated: "If you can get everything lined up I shall come to Chicago at the earliest possible date," and also, "I'd like to conclude this deal to our mutual satisfaction in the least possible time."

On April 4, 1955, while in the Chicago area again, defendant Proesel obtained a quitclaim deed from the Hartmans, who owned the remaining ⅓ undivided interest, which she held in trust for the purpose of a sale. Dettmar drove her to the law offices of Herman & Pollack and introduced her to Herman, whom she engaged to represent her in any sale of the property, as well as in probating her father's estate. According to the testimony of Dettmar, Herman stated that he would get things in shape so that defendant Proesel would have the right to sell the property. She then made proof of heirship at the probate court and returned to Washington the following day.

Under the date of April 15, 1955, Dettmar wrote Milani that the time for closing had been extended to June 15, 1955, and in the postscript acknowledged receipt of $4,500 additional earnest money. Dettmar was later criticized by Herman for writing that letter. He was told that he had no right to accept additional earnest money, and that he would have to get a cash deal, for the property could not be sold on the installment plan because of the outstanding taxes, special assessments, and bequests to the heirs. Dettmar, however, assured Herman that Milani was a rich man and would get the cash for the property. That testimony is uncontroverted.

On April 18, 1955, defendant Proesel wrote Dettmar a second letter from Washington, stating she wanted Milani

to have the property "at the quoted price and sincerely hope he makes millions on it," and expressing concern lest her sister Catherine's parcel be included in any sale.

In May, 1955, according to Milani's testimony, he met Dettmar at Herman's office, and was told that he would have to wait until probate was over; that the matter would be rushed through as fast as possible; and that he would have a deal and that there would be no trouble as to the time element. Shortly thereafter, he claims he hired a surveyor so that the boundaries and the exact footage of the property could be ascertained.

On June 1, 1955, defendant Proesel wrote the last letter to Dettmar, which included the statement relied upon by plaintiffs in support of their position, "I understand from Mr. Herman that we can give your client clear title of the E. P. property immediately although we, as my Dad's heirs cannot be reimbursed."

In July, 1955, Dettmar and Milani again met in Herman's office, and Herman repeated the necessity for a cash deal. Dettmar assured him again that he need not worry about the $65,000 cash. On July 29, 1955, defendant Proesel's petition, as executrix, to sell the property on Pratt Avenue for $65,000 to pay debts and expenses, "less the south 50' of east 163 feet," was filed in the probate court. On October 18, 1955, that court ordered the sale of the property for $65,000, finding specifically that "it is necessary to sell all or substantially all of the said real estate for the reason that the above mentioned taxes and special assessments were assessed against the entire tract, and it would be impossible to sell a portion of the said tract without first satisfying the liens of both the general taxes and special assessments; that the funds which will be required to satisfy said liens can be obtained only through the sale of the entire tract or substantially all of said tract."

That same day, Herman wrote Dettmar of the court's approval of sale, and that he might "proceed with the sale

to Dean Milani on the basis of $65,000 as the sale price."
Not hearing from Dettmar, the law firm wrote him again
on October 26, 1955, and further suggested that an escrow
be set up so that the unpaid general taxes and special assess-
ments could be paid out of the $65,000 sale price.

On October 28, 1955, Herman & Pollack wrote plain-
tiff Milani directly, stating that Dettmar had not replied to
their letters concerning the property in which, they knew,
Milani was interested, and that the probate court had ap-
proved its sale. They also suggested that an escrow arrange-
ment be set up for the liquidation of the unpaid taxes and
special assessments, and concluded by asking Milani to con-
tact them "at the earliest possible time." No reply or
other communication from Milani was received by Herman
during the next month, and on November 29, 1955, Her-
man wrote Milani another letter advising him that since
they failed to hear from him they "concluded that you have
no further interest" in the property.

According to Dettmar's testimony, he told Herman in
a telephone conversation on November 29, 1955, that Milani
would be in with the money sometime after the first of
the month. Dettmar also claims that sometime in Novem-
ber he told Herman at his office that he expected a com-
mission $6,500, even though that sum was in excess of
the recommendations of the real-estate board, and that
Herman informed him that there was a higher offer of
$67,500 for the property, but that Dettmar would receive
his commission in any event.

No further action was taken until December 22, 1955,
when Milani called defendant Proesel and arranged to meet
her at Herman's office. Milani appeared with counsel, and,
according to his testimony, in the course of the meeting he
tendered certified checks by laying them on the desk. He
was unable to recall, however, if they were in the amount
of $28,000 or $30,000, or on which bank they were drawn
and certified. The tender was denied by both Herman and

defendant Proesel, and, in corroboration thereof, defendant Proesel called attention to the lien pending against Milani at that time by the U. S. Government for unpaid income taxes in the amount of $47,632. Immediately after the meeting, Milani prepared an affidavit in which he claimed an interest in the property as purchaser, but made no mention of any tender.

On December 23, 1955, the day after the meeting, defendant Proesel conveyed the property to Robert Singer, as nominee for another purchaser, with a consideration of $72,500, including the parcel intended for defendant's sister.

On January 5, 1956, Milani filed suit against Dettmar and Proesel to recover the sum of $6,500 deposited as earnest money. As hereinbefore noted, this pleading was amended to set forth a claim by both Milani and the First National Bank of Lake Forest, as trustee, for specific performance of a contract. The circuit court awarded plaintiffs the relief prayed for, and defendants have appealed therefrom.

In reviewing the propriety of that decree, the essential inquiry is whether plaintiffs have established the existence of a valid contract, binding upon the party against whom performance is sought, for specific performance is never appropriate where there is no obligation to perform. (81 C.J.S. 476; 49 Am. Jur. 25; II Restatement, Contracts, § 358.) If the existence of a valid contract is a matter of doubt, equity will not decree specific performance. It is not enough to show that an agreement of some kind existed between the parties, or even that it has in whole or in part been performed by the plaintiff, but the contract must be clear, certain and unambiguous in its terms, and give an absolute right without further negotiations. *Wilger* v. *Wilger,* 409 Ill. 58; *Young* v. *Kowske,* 402 Ill. 114; *Scott* v. *Fowler,* 227 Ill. 104.

In the instant case it appears that the instrument sued on by plaintiffs Milani and the bank was, at the time of

its execution, at most an offer to purchase certain property listed for sale with the broker Dettmar by the deceased Lawrence Proesel in his lifetime. It is asserted by defendant Proesel, and denied by plaintiffs, that this offer was ambiguous and equivocal as to the identity of the purchaser.

As hereinbefore noted, the instrument bore no signature of any purchaser, for the bank's name was merely typed in the space for signing, and although Milani's initials appear, he was not the designated purchaser. There appears, moreover, to be some inconsistency in plaintiffs' theory as to who the purchaser was. Before the master it was argued that Milani's initials only bound him personally as *cestui* of the trust, whereas on this appeal it is contended that Milani signed his initials on behalf of himself and the bank, and that his authority to do so was based upon custom.

In support of this theory, plaintiffs rely upon the case of *Laegeler* v. *Bartlett*, 10 Ill.2d 478, where the court authorized specfic performance of a contract signed by a party as trustee, even though the contract made no reference to the trust, or to the trustee's authority to act. The court reasoned that since the persons seeking performance of the contract had signed as trustees, and had been dealt with in that capacity, the identity of the trust could have been established, and they could have been compelled to perform; hence, they should be able to enforce the contract.

Unlike the *Laegeler case,* there is no question herein about establishing the identity of any trust, and the vendor had no dealings with anyone in the capacity of a trustee or of an agent, since Milani alone was regarded as the purchaser. Moreover, the bank herein could not be bound as a purchaser, had the vendor endeavored to enforce any contract. It did not sign the alleged contract, had not participated in the transactions as a purchaser, and in no way authorized Milani to bind it. The record, furthermore, is devoid of any custom from which Milani's authority to bind the bank could be inferred, other than his own

general statement that on occasions he acted for the bank. Therefore, we find the *Laegeler case* an inappropriate authority, and must conclude that under the circumstances herein the designation of the purchaser under this offer is equivocal and ambiguous.

However, even if this court were to conclude that Milani signed the instrument both for himself and for the bank, in its capacity as trustee of a trust to be created in the future, there are other essential elements which must be established before a decree for specific performance could properly be entered.

It is undisputed that the real-estate form, relied upon as a contract, is not signed by anyone as vendor. Nor is there any evidence that Lawrence Proesel in his lifetime unequivocally accepted the offer. The earnest money check was dated after his death, and held in Dettmar's own account; and the scribbled notations on the back of the instrument made by Dettmar when he and Lawrence Proesel discussed the offer, certainly did not manifest an intention to regard the paper as a legal instrument. Nor did Dettmar's statement to Milani that Proesel never signed a contract, and that his word is his bond, signify that Proesel had, in fact, accepted this offer. The next query is, therefore, whether this offer was accepted by the defendant Marion Proesel.

Since Marion Proesel did not sign the real-estate form, her assent to its terms must be deduced from other documents. In order to create a contract, acceptance must be unequivocal (I Restatement, Contracts, § 58, p. 65), and two manifestations of willingness to make the same bargain do not constitute a contract, unless one is made with reference to the other. (I Restatement, Contracts, § 23, p. 28.) Therefore, before she could accept the offer, she must know its terms.

Defendant Proesel unequivocally denied that she even knew of the existence of the document, much less its terms,

and there is no evidence that Dettmar ever showed it to her or discussed with her the sale of the property in parcels or on a time basis, as the offer provided. It is not clear whether she could have possibly seen the document when it was delivered to Herman, since the testimony is conflicting as to when such delivery was made; nor is there a single reference in any of her letters to any option, or sale of parcels, or time payments, which would reveal a knowledge of the terms of the offer. The phrases in her letters, relied upon by plaintiffs as establishing a contract, including "I'd like to conclude the deal to our mutual satisfaction in the least possible time," or, "I want Milani to have the property at the quoted price," must be construed in the light of their context and the circumstances under which they were written.

In view of her limited knowledge of real-estate matters, and reliance upon Dettmar as a friend in such transaction, said defendant's use of the words "deal" and "quoted price" cannot be given any technical meaning of the trade. The fact that the statements were made to Dettmar, and not to a purchaser, and at a time when she knew she had not power to sell, militate against construing them as embodying a contractual intent. Moreover, those statements must be construed along with her account that she was following directions to expedite the probate of the estate, which she knew was essential before any sale could be made, and her repeated expressions of concern lest the property intended for her sister be included in any sale, all of which evidence a lack of finality in the pending transaction. Under those circumstances, the phrases relied upon by plaintiffs indicate at most her desire to sell the property and secure the $65,000 as soon as possible in view of the estate's need for funds and the difficulties of her commuting from Washington. Therefore, to take the phrases of a layman, unfamiliar with real-estate transactions, out of their context in correspondence with one relied upon as a friend, and

to construe them as "operative acts" creating a contract, as plaintiffs argue, would be a grievous judicial error. As stated in *Scott v. Fowler,* 227 Ill. 104, "care should be taken not to construe as an agreement letters which the parties intended only as preliminary negotiations."

Nor can we accept plaintiffs' theory that the petition for sale filed by defendant Proesel, as executrix for the estate, constituted her adoption of the offer. On the contrary, since both the petition and the court order entered thereon refer to the necessity for a cash sale for $65,000 to satisfy tax liens and special assessments, they are inconsistent with the term of plaintiffs' offer. There mere fact that the petition requests the same total price does not constitute approval of all the terms of the offer. Therefore, in our judgment defendant at no time evidenced an unequivocal acceptance of the offer submitted by plaintiff Milani for the purchase of the controverted property.

Nor did Dettmar's unauthorized acceptance of additional earnest money affect defendant Proesel's obligation (*Kohlbrecher v. Guettermann,* 329 Ill. 246,) particularly in light of Dettmar's close relationship to Milani, whereby he undertook to sell some of Milani's property and "hoped to" resell the controverted property for Milani.

The inconclusive nature of the transaction between the parties is further evidenced by the letters written by defendants' counsel to Dettmar, and later to Milani, after the probate court authorized the sale of the property, in which, for the first time since the death of Lawrence Proesel, consideration was given to the time and place of payment through an escrow arrangement.

Although the original provisions of plaintiff Milani's offer respecting the time and terms of payment could not be followed because of the necessity for probating the estate, nevertheless, the negotiations of the parties left such factors undetermined, as well as the exact area of the property to be allocated to defendant Proesel's sister. Where

the material terms and conditions of a contract are not ascertainable, and where the negotiations have not reached the point where the agreement gives the parties an absolute right without further negotiations, no enforceable contract is created. *Morey* v. *Hoffman,* 12 Ill.2d 125; *Daytona Gables Development Co.* v. *Glen Flora Investment Co.* 345 Ill. 371; *Young* v. *Kowske,* 402 Ill. 114.

The facts in the case at bar are analogous to those in the last case cited, (*Young* v. *Kowske,* 402 Ill. 114,) where the court denied specific performance of a contract to convey real estate on the ground that at the time the contract was signed by the parties there existed in the minds of the parties different conceptions of the manner and time of payment. The court, in analyzing the situation, stated at p. 118: "However, since both documents [the contract and escrow] provided for the manner and time of payment for the same real estate, and involved the same transaction, we cannot come to the conclusion that the contract sued on in this case sets forth all of the terms agreed upon between the parties, after a full and complete understanding and meeting of the minds."

The analogy to the instant case is striking in that plaintiff Milani's conception of payment was according to the terms of his offer, which allowed a partial purchase, an option for the remainder of the property, and a time interval; whereas the evidence is undisputed that defendant Proesel intended and expected only to sell all the property at once, except her sister's parcel, for $65,000. In addition, in the instant case Milani's silence for over a month after being informed by Herman that the property could be sold, further evidences the inconclusive nature of the transaction.

Under the view we take of the cause, we need not consider the necessity or the sufficiency of any tender of the purchase price by plaintiffs, inasmuch as the ambiguity in the description of the purchaser, the lack of assent by defendant Proesel to plaintiffs' offer, and the inconclusiveness

of essential elements of the transaction, precluded the existence of a valid contract capable of being specifically enforced. It was therefore error for the circuit court to enter the decree for specific performance, and the decree should be reversed and the cause remanded with directions to enter a decree ordering the return of the earnest money paid to Dettmar by plaintiff Milani.

*Reversed and remanded, with directions.*