No. 2--08--1206    Filed:  12-21-09

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| RICHARD A. ANDERSON and SANDRA P. ANDERSON, | ) ) ) | Appeal from the Circuit Court of De Kalb County. |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | No. 00--CH--16 |
| DONALD J. KOHLER, BETTY J. KOHLER, and ARROWHEAD DEVELOPMENT GROUP, | ) ) ) ) | Honorable Edward C. Schreiber, |
| Defendants-Appellees. | ) ) | Judge, Presiding. |

_____

JUSTICE O'MALLEY delivered the opinion of the court**:**

Plaintiffs, Richard A. Anderson and Sandra P. Anderson, appeal the judgment of the trial court in favor of defendants, Donald J. Kohler, Betty J. Kohler, and Arrowhead Development Group, following a bench trial on plaintiffs' complaint for breach of a contract for the sale of land.  We affirm.

BACKGROUND

In March 2000, plaintiffs sued defendants, alleging that Donald Kohler (Kohler) agreed to sell Richard Anderson a parcel of land for use as an airstrip and that Kohler later refused to sell the land.  In counts I and II of their complaint, plaintiffs sought specific performance of the contract.  In count III, plaintiffs sought compensation for their efforts in preparing the airstrip for use in anticipation of the sale and for the cost of storing their planes with a third party once Kohler refused

to sell the land. Defendants raised section 2 of the Frauds Act (statute of frauds) (740 ILCS 80/2 (West 2006)) as an affirmative defense; defendants asserted that any agreement for the sale of the airstrip was never reduced to writing and thus was unenforceable.

When the case was originally tried to the bench, the trial court entered a finding in favor of defendants following plaintiffs' case-in-chief. We reversed that judgment. See Anderson v. Kohler, No. 2--02--1274 (2003) (unpublished order under Supreme Court Rule 23) (Anderson I). While that appeal was pending, the judge who presided over the trial retired. On remand, the successor judge, over plaintiffs' objection, barred them from presenting their case-in-chief anew and instead based his decision on a transcript of their case-in-chief, together with the new evidence presented in defendants' case-in-chief and plaintiffs' rebuttal case. Anderson v. Kohler, 376 Ill. App. 3d 714, 715 (2007) (Anderson II). We reversed and remanded for a full trial de novo at which the successor judge would make credibility findings based on his own observation of the witnesses. Anderson II, 376 Ill. App. 3d at 724.

At the bench trial on remand, Richard Anderson testified that he works in the aviation industry and has a machine and fabricating shop on his property in rural Sycamore. Richard and his son, David Anderson, own planes. The Sycamore property has a hangar for housing the planes. Richard had an airstrip on his property that was approved by the Illinois Department of Transportation (IDOT) in 1976. Richard and David would use the airstrip for business and pleasure flights. In spring 1994, Richard and David were clearing brush from the airstrip when they were approached by Donald Kohler, who owned adjacent property. Kohler proposed that he and Richard combine portions of their properties to make a subdivision. The portion Kohler suggested Richard contribute included the airstrip. When Richard voiced concern about relocating the airstrip on his property, Kohler suggested that it would be "easier" if Richard instead built a new airstrip on a

portion of Kohler's land that he recently purchased from his neighbor, Ray Larson. Richard said he would have to stake out the airstrip to see if the property was large enough. Kohler said "fine" and invited Richard to stake it out. Richard asked Kohler "are we going to buy this or what are we doing," and Kohler replied that "he would sell [Richard] the runway." Kohler then mentioned the issue of price and noted that he had paid Larson about $1,300 an acre for the property. Richard suggested that he and Kohler "have an appraisal and go [with] fair market value." Kohler said that this was "fine." Richard and Kohler also agreed that closing would occur once IDOT approved the new airstrip.

Richard testified that David was only intermittently engaged in the conversation because he continued to clear brush while Richard and Kohler spoke. David expressed disfavor with the subdivision proposal until Kohler told him, too, that the airstrip could be relocated to Kohler's property. Richard denied that he and Kohler discussed at the meeting the possibility of renting the airstrip. Richard estimated that the conversation lasted about 30 to 45 minutes.

Richard testified that he and David staked out the property and found it adequate for the airstrip. They built the airstrip, which consisted of 11.5 acres. In March 1995, IDOT issued its formal approval of the airstrip. Even before that, however, based on IDOT's informal approval, Richard told Kohler that they could "go ahead" with the subdivision and asked Kohler "when can I get [the airstrip] bought." Kohler explained that the airstrip was currently under lease to Art Bingham, a farmer and mutual friend of Kohler and plaintiffs, and that closing would have to be postponed until the lease expired in 1998. Kohler proposed a "lease" to Richard "[a]long with a [sale]." Richard said that this was "fine," and Kohler told Richard to speak with Bingham about subleasing the airstrip. Bingham agreed to a sublease, and Richard and David began using the airstrip in spring 1995. For the years 1994 and 1995, Richard paid Bingham "in kind" by letting him

lease a portion of Richard's land. For the remaining years, Richard paid money for use of the airstrip. The lease was entirely oral and was year-to-year.

Richard testified that he and Kohler proceeded with the subdivision, which they named the Arrowhead Subdivision. The development subsumed the airstrip on Richard's property. Some of the lots for the subdivision were built entirely on either Richard's or Kohler's property while others overlapped both properties (the common lots). Richard testified that the terms of the subdivision agreement between him and Kohler were oral except for what related to the common lots. Plaintiffs introduced a copy of a joint venture agreement for the Arrowhead Subdivision, signed October 18, 1995, by Richard and Kohler. The joint venture agreement's stated purpose was "to develop and sell lots 9, 10, 11, 12, 14, 15[,] and 26 in Arrowhead Subdivision." Richard testified that the seven lots identified in the joint venture agreement were the common lots. The joint venture agreement provided that the costs of developing the lots were to be "shared as agreed by the parties." The agreement also specified percentages for splitting the profits from the common lots.

Richard testified that the conversations in spring 1994 and 1995 were two of "several" occasions in which he spoke to Kohler about "buying" the airstrip. Richard testified that, though Kohler agreed at the spring 1994 meeting to sell the airstrip for fair market value based on an appraisal, they "never got to the point where we were going to talk about a [specific] appraiser," because Kohler "avoided the subject." When Richard raised the issue of an appraisal, "it was always just swept under the rug or put off" by Kohler. Kohler would "always say, 'Well, I can't do that now' or, 'We really need to do a trade. Let me see what I got coming for property. I have a deal with [Bingham] here and there.' " Richard noted another occasion in which Kohler said "he'd have some problems without a trade." Richard replied: " 'Well, I don't mind helping to stay out of the government a little bit, but I'm interested in just buying this piece. Now, if you have something you

-4-

want to direct the money [sic], that's fine. I don't care. That part of it is great.' " In 1996, Richard and Kohler attended an auction for farm property where they again spoke about Richard's acquiring the airstrip. Richard bid on property at the auction because he wanted "to be able to work out something that was acceptable to [Kohler], if he wanted to do a trade." Richard testified:

"Q. Did you ever say to [Kohler] that you would be willing to trade this property?

A. He asked if I would get into a trade to help--

Q. And you tried to trade in fair?

A. No. [Kohler] had to pick out the property. I can't pick out property for [him]. If he wanted to use the money that I paid for his runway in a stock or trade somehow or another, that would be fine. I have no problem with helping him taxwise.

Q. But if--

A. But the bottom line was my deal with [Kohler] was not a trade. My deal with [Kohler] was to buy the runway. If we wanted to help himself on a trade, I was more than willing to go along with that."

Richard testified that at no point in their multiple conversations about the new airstrip did Kohler say "that he would not sell the property" to Richard.

Richard testified that he and Kohler did not close on the airstrip even after the expiration of Bingham's lease in 1998; rather, Kohler closed the airstrip. Richard explained that, while he was out of the country at the end of 1998, David phoned to inform him that Kohler was erecting a fence to block the airstrip. Since Richard now could not land on his property, he landed at a nearby airport and stored his plane there. Richard returned home to find a letter from Kohler dated December 23, 1998, but postmarked December 28, 1998. The top half of the letter specified amounts "due Arrowhead Development Group" for November and December 1999. The bottom half read:

"In regard to the airstrip, [Bingham] informed me that he notified you or [David] on or before November 15, 1998[,] that his lease with us would expire on November 30, 1998[,] and that you or [David] would have to contact me for a new lease. Also, our Attorney notified Mr. Klein [Richard's attorney] of the expiration of your lease with Mr. Bingham which would also be November 30, 1998, and that you should contact us for a meeting by December 22, 1998.

As I have not been contacted for a new lease for this property, please be advised that this airstrip is closed as of December 23, 1998, and any further activity on this property will be considered as trespassing."

Richard noted that, at the time the letter was written, he and Kohler were disagreeing over the division of costs associated with the subdivision. Richard denied that he had received any notice from Kohler prior to the December 23, 1998, letter. Richard testified that, though the letter directed him to make arrangements directly with Kohler for use of the airstrip, Kohler later told him to deal with Bingham again. Kohler opened the airstrip again in July 1999 after Richard and Bingham reached another subleasing agreement. The agreement ran from July to November 1999. Richard noted that there had been some difficulty in arranging the sublease because Kohler wanted Richard to produce a certificate of liability insurance. Richard introduced into evidence a copy of a certificate of liability insurance issued to him, for a term of April 1997 to April 2000. Richard testified that he delivered the certificate to Kohler on July 15, 1998.

Richard testified that, in spring or summer 1999, David and Kohler had a meeting about "buying the runway." Kohler told David that he was upset with Richard and did not want to speak with him. After David's meeting with Kohler, Jordan Gallagher, Kohler's attorney, sent Richard a letter on May 5, 1999, which opened with this paragraph:

"I have been retained by [Kohler] to assist him in attempting to resolve the issue of the airstrip which he owns and which you have used for the past several years. To bring this matter to a close, [Kohler] has authorized me to offer you various options with respect to the airstrip."

The four options described were: (1) lease of the airstrip from Kohler directly; (2) sale of the airstrip for $150,000; (3) sale of a larger parcel including the airstrip, for $3,000 per acre; and (4) trade of the airstrip for "12 acres from the Larson farm with the same elevation and acreage as to [sic] the acreage contained in the landing strip." The letter stated that, if Richard did not reply by Friday, May 7, 1999, at 5 p.m., Kohler would lease the airstrip to a farmer, who would prepare the land for planting. Richard's attorney, Ron Klein, faxed the following reply on May 7, 1999: "We agree to the option wherein [Richard] will trade to Kohler an equal number of acres provided they are acceptable to [Kohler] and we can work out the details." Richard testified that, by this letter, he "accepted [Kohler's] offer" to trade for the airstrip. The trade never occurred, however, because Richard wanted to trade "acre for acre" based on area alone but Kohler wanted both area and elevation to be considered.

Richard testified that, on April 17, 2000, he received a letter from Kohler himself. The letter stated:

"I received a copy of the letter to you dated April 11, 2000[,] from [Bingham] saying that you probably do not have any interest in the eleven acres any more [sic]. If you decide you have any interest in leasing or purchasing this property, notify me in writing by April 30, 2000. If I do not receive any notice from you by April 30, 2000, we will have [Bingham] put it back into production."

Richard then had David approach Kohler to "see what we can do *** [a]bout buying this runway." Richard had an appraisal prepared and submitted it to Kohler, but that did not "help get the property sold."

Richard testified that, on May 1, 2000, he entered into a written lease with Kohler for the airstrip. Richard rented the property again from Kohler in 2001 but was unable to locate the written lease in preparing for trial. Richard did introduce a check from Richard to Kohler dated November 1, 2000, representing rent for the upcoming year. In 2002, Kohler "plowed up the runway" and Richard and David have not used airstrip since.

Richard acknowledged that his net profits from the subdivision exceeded $500,000. Richard emphasized, however, that he would not have agreed to the subdivision if he knew it meant losing his airstrip, no matter how he stood to profit. Richard denied ever telling Kohler that he wanted to relocate the old airstrip because he was fearful that the State would close it down in response to neighbors' complaints. Richard testified that he had received no complaints about the airstrip since it was approved in 1976. Richard stated that at all times after spring 1995, he was "ready, willing, and able to buy [the airstrip]."

David Anderson testified to the spring 1994 conversation Richard had with Kohler about the airstrip. David heard "parts" of the conversation, and took part intermittently, as he continued to work on the airstrip. At one point, Kohler asked David what he thought of the subdivision idea, and David said he "didn't think very much of it at all." When Kohler informed David that he was "working out a deal to sell the property in the back to [Richard]," and thus to preserve the airstrip, David said that the whole proposal sounded "fine." Kohler said David could stake out the property to see if it was adequate for the airstrip, but Kohler told David to wait two weeks while Kohler spoke

to Bingham, who was currently leasing the property. David testified that he did not hear Richard and Kohler discuss a price for the airstrip aside from "when they were talking about the Larson farm."

David testified that he staked out the airstrip on Kohler's property, and Richard arranged a sublease of the airstrip from Bingham. On one occasion while he was out working on the airstrip, David spoke to Bingham and said that Kohler agreed to sell the airstrip to Richard. Bingham replied that he knew the sale would happen. When David finished the airstrip, Kohler looked it over and said it was "good to go." Richard and David began using the airstrip in spring 1995 after IDOT approved it. Richard continued to sublet from Bingham into 1998. In December 1998, while Richard was out of the country, David witnessed Kohler erecting a fence across the airstrip. David approached and Kohler confirmed that he was closing the airstrip. David remarked that he thought Kohler was "going to sell us the property" and that he was "a man of his word." Kohler replied that he "didn't get along with [Richard] anymore" and he "didn't have to sell the property if he didn't want to." Kohler mentioned that he had sent Richard a letter "with some options," and David said he had not seen the letter. Kohler also remarked that he would consider Richard and David's further use of the airstrip to be trespassing. After phoning Richard, David sorted through Richard's mail and saw the December 23, 1998, letter from Kohler. David testified that, contrary to the representations in the letter, he had never been contacted by Bingham and told to deal directly with Kohler about the airstrip.

David testified that, in spring 1999, Kohler phoned him and asked to meet and "see if [they] could come to some terms." At the meeting, Kohler said that he realized that David was "pretty upset" about the closing of the airstrip. David remarked that the "attorneys" would make Kohler "[s]ell us the runway." David also said that he did not feel that Kohler was "being a man of his word." David "tried to write some things down on paper [but] [Kohler] said he would not sign

anything." Kohler said he would have to "get back to [David] at a later time." Kohler did not say during this conversation that he would sell the airstrip to Richard. Later, Kohler sent the letter dated May 5, 1999, in which he proposed various options with respect to the airstrip.

David testified that he and Richard began using the airstrip again in July 1999 through another sublease from Bingham, not a direct lease from Kohler. In 2000 and 2001, Richard leased the airstrip directly from Kohler, per his wishes. In 2002, Kohler sent a letter stating that he was closing the airstrip because Richard no longer was showing interest in it.

Donald Kohler also testified to the spring 1994 conversation he had with David and Richard while the two were working on the airstrip. When Kohler proposed the subdivision, Richard said that he wanted to preserve his airstrip. Richard said that he was concerned that the State would shut down his current airstrip because of increasing residential development. Richard said that he would not agree to the subdivision unless he could get another airstrip. Richard remarked that the west end of Kohler's property would be an "ideal" place for an airstrip. Kohler told Richard that the land was currently leased to Bingham but that he was sure that Bingham would sublet it to Richard. Kohler also mentioned that "maybe if we could work out a deal we could sell it to [Richard] sometime." Richard said he would not commit to the subdivision unless the airstrip met his needs and IDOT approved it. Kohler invited Richard to stake out the property to see if it was suitable and to contact Bingham about subleasing it. Kohler testified that he and Richard never discussed "fair market value" or a "closing date" because the agreement was for lease only, not sale. Kohler testified:

"Q. Mr. Kohler, you knew [Richard] would not go into that subdivision if he could not get another air strip [sic]; isn't that correct?

A. That's correct.

Q. And so that air strip [sic] was going to have to be sold to him or traded to him; isn't that correct?

A. No. It could be leased, which we told him we would probably do or that we would at least lease it to him."

Kohler testified that Bingham agreed to sublease the airstrip and that Richard and David prepared it for use. In spring 1995, IDOT approved the airstrip. At that time, Richard told Kohler that he would like to purchase the property. Kohler replied that he "wouldn't do anything" until the lease with Bingham expired in 1998, but, after that, "if we could get together, we could sell it to him." Richard proposed that they base the price on fair market value. Kohler was asked about his reaction to this proposal:

"Q. Did you say that would be a fair way to go?

A. No. I said that if [sic] we would have to probably trade him if we did anything.

Q. But still the idea would be that he would obtain ownership of the air strip [sic]; is that correct?

A. If we could find property that we could train [sic] for and he could have it.

Q. But the idea is that he would end up owning that property through a trade?

A. Right, right.

Q. And that trade would have to be fair; is that correct?

A. Why, sure. Why not?

Q. So the idea of fair market value or fairness was involved in that conversation, too; correct?

A. No, I don't think so. I think he just mentioned fair market value that time. He may have mentioned it several times. We had numerous conversations because through the subdivision as we kept getting bids and stuff and it would sometimes come up, I'm sure.

Q. Did you tell him that you thought fair market value was fair?

A. I told him that if we could work out a deal, we would sell it to him.

Q. And that fair market value would be okay?

A. That--yes, yes."

Elsewhere in his testimony, Kohler noted again that in spring 1995, after Richard obtained IDOT approval, Richard said "something about fair market value" and Kohler replied that that "would be a fair way to determine the value of the property *** if we would get together and make the deal."

Kohler testified that Bingham's lease was to expire in November 1998. Kohler decided to exclude the airstrip from Bingham's new lease. Bingham had said that he "didn't want to deal with [the sublease] anymore." Kohler also believed that to have Richard arrange a lease directly from him was "a way *** to get [Richard] to the table to talk about the problems [they] were having with the subdivision," as Richard had thus far refused to discuss the subdivision issues. Asked if he "really [wanted] to keep [the airstrip] out so that [he] could fulfill [his] obligation to [Richard] to sell it to him," Kohler answered: "Lease it, maybe sell it to him if we could work out a deal." Kohler testified that, shortly after October 1, 1998, he asked Bingham to inform Richard that the sublease would end November 1, 1998, and that Richard would have to lease the airstrip directly from Kohler. When Kohler was asked why he had Bingham notify Richard when the dealings were to be between him and Richard anyway, he answered at one point that Bingham may have offered to do it as "a courtesy," but elsewhere Kohler answered that he "really [didn't] know why" Bingham was the one who contacted Richard about the lease. Kohler testified that Bingham reported back and confirmed

that he notified David as instructed. Shortly after November 1, 1998, having heard nothing from David or Richard, Kohler contacted Klein, Richard's attorney, and said he would close the strip if he did not hear from Richard by December 22. Klein said he would so inform Richard. Kohler again notified Klein shortly after December 1.

Kohler testified that, when December 22, 1998, passed without a response from Richard, Kohler sent the December 23, 1998, letter and proceeded to close the airstrip. David approached while Kohler was closing the airstrip and commented that Kohler was closing the airstrip because of the dispute over the subdivision. Kohler denied this was so and said that he was closing the airstrip because Richard "didn't have a lease on it" since he failed to act in time. Kohler testified that the closing of the airstrip could not have been related to the subdivision dispute, because Kohler eventually agreed to a lease of the airstrip to Richard the following year.

Kohler testified that Bingham's lease for 1999 included the airstrip. Bingham agreed to act as a "go-between" for Richard and Kohler. Bingham asked Kohler whether he could again sublet the airstrip to Richard, and Kohler agreed. The airstrip was closed from December 1998 to July 1999, when Bingham and Richard signed a sublease agreement. In spring 1999, David and Kohler met to discuss the airstrip. David "asked if [Kohler] would sell" the airstrip, and Kohler replied that "maybe we would sell it to him if we could get something worked out[,] but nothing had been worked out yet." Kohler then had Gallagher send the May 5, 1999, letter.

Kohler testified that, in 2000 and 2001, he leased the airstrip directly to Richard. The 2001 lease was due to expire on November 1, 2001. On October 16, 2001, Kohler sent Richard a note asking him to indicate by October 25, 2001, whether he wished to renew the lease, otherwise Kohler would rent to Bingham, who would convert the airstrip to farmland. On October 22, 2001, Richard sent Kohler a 2002 lease for Kohler's signature as well a check for $1,760. Kohler returned the lease

and check because Richard had not enclosed the required certificate of insurance. Kohler left a message with Klein's office that, if Richard did not arrange his own insurance, the rent would be $3,000 instead of $1,760. Klein's office informed Kohler that Richard did not want to rent at that price. This was the "last transaction" Kohler had with Richard or David. Kohler let Bingham farm the airstrip again.

Kohler testified that, though a certificate of insurance from Richard was required each year Richard leased or subleased the airstrip, Richard provided a certificate for only "one or maybe two" years. Kohler acknowledged that he rented to Richard in 2000 and 2001 even though the certificate of insurance introduced at trial was for the term April 1997 to April 2000.

Kohler testified that he and Richard never "ha[d] a deal" for the sale of the airstrip. They never agreed on a price or on a means of calculating a price, such as fair market value. They also never agreed on an appraiser.

Art Bingham testified that it was his idea that Richard and Kohler combine their properties to form a subdivision. When Richard began subletting the property from Bingham in 1994, Bingham told David that Kohler wanted a certificate of insurance from Richard. David showed "some reluctance" to get a certificate. In October 1998, Kohler asked Bingham to tell David that Richard would have to talk directly with Kohler about leasing the property for the following year. Bingham did as asked and contacted David. David asked why Kohler decided to exclude the airstrip from Bingham's lease, and Bingham replied that he did not know the reason and that David would have to speak to Kohler. After Kohler closed the airstrip in late 1998, Bingham offered to be an "intermediary" between Richard and Kohler. As a result of Bingham's efforts, Kohler allowed Richard to sublet the airstrip from Bingham beginning July 1999. Bingham sent Kohler a letter on July 10, 1999, memorializing his efforts of the past few months. In the letter, Bingham wrote that

Kohler had told him in May 1999 that "there were difficulties in coming to an agreement with [David and Richard] over the airstrip." Asked what "difficulties" were referenced there, Bingham testified: "I would assume it was over the rental because that's the only thing that I had anything to deal with there."

At the close of the evidence, the trial court ruled in favor of defendants. The court said:

"I do not believe that there was ever a clear meeting of the minds as to price or even whether this was to be a trade or sale of land. There is no clear agreement as to when that would occur or how any price or fair market value would be established, and the price of land clearly fluctuates from year to year due to a variety of factors.

I do not believe the evidence supports the existence of an oral contract that is clear, definite, and unequivocal."

The trial court gave several supporting reasons. First, the court found that the oral year-to-year sublease that ran from 1994 to 1998 could have been terminated by either Richard or Bingham with proper notice. Since Bingham "could have on his own terminated or discontinued the lease" and "could have plowed over the airstrip and returned it to crop production, *** the creation of the grass air strip [sic] in and of itself was [not] evidence of specific performance of an oral contract for the sale of real estate." Second, the court found it significant that the subdivision agreement addressed various "terms, conditions[,] and responsibilities" but did not reference "[t]he airport or proposed sale or trade of land for the airport." Third, the court noted that the December 23, 1998, letter from Kohler did not mention "a sale or trade of land." Fourth, the written lease between Kohler and Richard for November 1999 to November 2000 states that, at the end of the term, the lessee was required to "yield up the premises to Lessor in good condition and repair." Fifth, the May 5, 1999, letter from Kohler, which proposed a sale but did not reference any existing sale agreement,

"would indicate at least to [Kohler's] mind that there was not yet an agreement oral or otherwise regarding the property." Sixth, Richard's faxed note of May 7, 1999, contained "no mention of *** any prior agreement or breach of any oral contract to sell" and, moreover, was "a counter-offer to trade a lesser amount of land and even then it was contingent on being able to work out the details." Seventh, the court found Bingham to be "very credible" and noted that "his testimony supported the absence of any clear and definite meeting of the minds."

After the trial court denied their posttrial motion, plaintiffs filed this timely appeal.

ANALYSIS

To prevail on a breach of contract claim, the plaintiff must plead and prove that (1) a contract existed; (2) the plaintiff performed his obligations under the contract; (3) the defendant breached the contract; and (4) the plaintiff sustained damages as a result of the defendant's breach. International Supply Co. v. Campbell, 391 Ill. App. 3d 439, 450 (2009).

The parties agree, and the evidence at trial confirms, that there was no written agreement, even in part, for the sale of the airstrip. Defendants claim that this case is therefore controlled by the statute of frauds, which provides in relevant part:

"No action shall be brought to charge any person upon any contract for the sale of lands, tenements or hereditaments or any interest in or concerning them, for a longer term than one year, unless such contract or some memorandum or note thereof shall be in writing, and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized in writing, signed by such party." 740 ILCS 80/2 (West 2006).

The existence of an oral contract, its terms, and the intent of the parties are questions of fact, and the trial court's determinations on those questions will be disturbed only if they are against the manifest weight of the evidence. Laughlin v. France, 241 Ill. App. 3d 185, 195 (1993). "A finding is against

the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." Best v. Best, 223 Ill. 2d 342, 350 (2006).

Plaintiffs argue that their own performance under the alleged oral agreement suffices to avoid application of the statute of frauds here. Plaintiffs assert the doctrines of full performance and partial performance. The doctrine of full performance "provides that where one party completely performs a contract, the contract is enforceable and the statute of frauds may not be used as a defense." Greenberger, Krauss & Tenenbaum v. Catalfo, 293 Ill. App. 3d 88, 96 (1997). "Statutes of Frauds are designed to prevent false claims by requiring a writing to evidence the parties' contractual intent." Meyer v. Logue, 100 Ill. App. 3d 1039, 1043 (1981). "When one party fully performs his part of the alleged oral contract, however, the courts recognize that this very performance strongly indicates the existence of a contract." Meyer, 100 Ill. App. 3d at 1043-44. "Such performance tends to minimize the dangers that the Statute of Frauds [was] designed to prevent." Meyer, 100 Ill. App. 3d at 1044.

Plaintiffs argue that Richard fully performed his obligations under the alleged oral agreement. Richard, plaintiffs claim, "did everything Kohler wanted him to do," including (1) agreeing to join his land with Kohler's to form a subdivision; and (2) waiting, at Kohler's request, for Bingham's five-year lease to expire. This was not the extent of the consideration required of Richard, as plaintiffs elsewhere note in describing the alleged oral agreement. The airstrip, they state, "was to be sold for its fair market value determined by appraisal." While Richard testified that he submitted an appraisal to Kohler, there is no evidence that Richard ever tendered a purchase payment. In the case of an alleged oral agreement for the sale of land, "where the consideration is fully paid and possession given the purchaser, there is sufficient performance to take the agreement out of the Statute of Frauds." Thomas v. Moore, 55 Ill. App. 3d 907, 912 (1977), citing David v. Schiltz, 415 Ill. 545,

555 (1953). Even if it could be said that Richard took possession of the airstrip,[1] he made no tender of payment, and therefore could not have fully performed under the alleged contract. See Koenig v. Dohm, 209 Ill. 468, 479 (1904) (payment of less than full price agreed on was insufficient to take contract out of statute of frauds). Whether his actions constitute part performance sufficient to avoid the statute of frauds is the question we address next.

Relief under the doctrine of partial performance is appropriate where " 'the terms of the contract are clear, definite, and unequivocal [citations], *** the contract has been at least partially performed by the party seeking the remedy [citations] and *** the acts allegedly done in performance are positively attributable exclusively to the contract [citations].' " Intini v. Marino, 112 Ill. App. 3d 252, 256 (1983), quoting Blaise v. Stein, 75 Ill. App. 3d 793, 796 (1979). In contrast to the doctrine of full performance, partial performance is an equitable doctrine, and the only contractual relief it affords is specific performance. See Doherty v. Kahn, 289 Ill. App. 3d 544, 561 (1997) ("part performance will avoid application of [the statute of frauds] only where a party is seeking the equitable remedy of specific enforcement," and the doctrine "may not be invoked to sustain an ordinary action at law for damages for breach of contract"). As noted, the existence of a contract is a question of fact, and the trial court's determination will be not be disturbed unless it is against the manifest weight of the evidence. See Laughlin, 241 Ill. App. 3d at 195. Even where a contract is shown to exist, the trial court has discretion whether to grant specific performance. See Keating v. Frint, 291 Ill. 423, 429 (1920) (" 'An application for the specific performance of a contract is addressed to the sound legal discretion of the court, and it is not a matter of course that it will be

---

[1]Richard's possession was, of course, only intermittent.

decreed, because a legal contract is shown to exist' "), quoting Frisby v. Ballance, 5 Ill. 287, 299 (1843).

Here, the trial court found that no contract existed in the first instance because "there was [n]ever a meeting of the minds as to price or even whether this was to be a trade or sale of land." From our review of the findings, it appears as if the trial court did not resolve the conflict in the testimony over what was agreed to at the spring 1994 meeting between Richard and Kohler on the airstrip. Richard testified that Kohler agreed to sell him a parcel of land for an airstrip and that the price was to be fair market value as determined by an appraisal. David, who did not listen to the entire conversation, testified that Kohler said that he and Richard were "working out a deal" for the sale of the airstrip. Kohler, however, testified that he agreed only to rent the property and that he told Richard that he would "maybe" sell if they "could work out a deal."

As we construe its findings, the trial court, rather than resolve this critical conflict, looked to the parties' subsequent course of conduct for evidence of an agreement. The court, it seems, made an initial finding followed by a series of alternative findings. First, the court determined from various aspects of the evidence (the subleasing agreement with Bingham and the various notes and letters exchanged by the parties, none of which mentioned a prior sale agreement) that there never was an agreement to convey the airstrip. Second, the court reasoned that, even if the parties reached an agreement to convey, there was no agreement whether the airstrip was to be conveyed by trade or sale. Third, the court reasoned that, even if sale was the agreed term, there was no "clear agreement" as to price because "fair market value" is too indefinite given fluctuations in the price of land.

We agree that, even if there was a sale agreement, its terms were not definite enough. Relief based on part performance is appropriate only where the contract is "clear, certain and unambiguous

-19-

in its terms, and give[s] an absolute right without further negotiations." Milani v. Proesel, 15 Ill. 2d 423, 430 (1958); see also McDaniel v. Silvernail, 37 Ill. App. 3d 884, 887 (1976) ("Before part performance can be effective there must be a contract and all of its essential terms must be certain and definite"). Plaintiffs argue that Richard and Kohler "agree[d] that it would be fair and proper to sell the property for its fair market value" and that the price term was therefore definite. See Miller v. Bloomberg, 26 Ill. App. 3d 18, 19 (1975) ("where a contract specifies that the price is to be measured by the 'fair market value,' 'reasonable value,' or 'current market value' of the services or the property involved, courts have generally held that the price is sufficiently certain in order to have an enforceable obligation"). As evidence that the parties agreed to a sale based on fair market value, plaintiffs cite, of course, Richard's account of the spring 1994 conversation, according to which Kohler agreed to sell the property for fair market value as determined by an appraisal. Plaintiffs also see Kohler making a critical admission in the following exchange concerning the spring 1994 conversation:

"Q. Did [Richard] tell you [in spring 1994] that he wanted to be fair with you in terms of purchasing the property?

A. I don't think anything was ever even--price-wise was ever even mentioned or talked about on that first conversation.

Q. But he said that he wanted to be fair about purchasing the property from you, did he not?

A. Not at the first date.

Q. All right.

A. I don't believe so.

Q. At some time he did say that; is that correct?

-20-

A. He said fair market value.

Q. And when did he say that?

A. I believe he said that when--after he got that letter in the spring of '95, it would be.

Q. You mean from the IDOT?

A. For the airport.

Q. All right.

A. For his air strip [sic] would be approved.  He talked about that and said something about fair market value.

Q. Did you say that would be a fair way to go?

A. No.  I said that if [sic] we would have to probably trade him if we did anything.

Q. But still the idea would be that he would obtain ownership of the air strip [sic]; is that correct?

A. If we could find property that we could train [sic] for and he could have it.

Q. But the idea is that he would end up owning that property through a trade?

A. Right, right.

Q. And that trade would have to be fair, is that correct?

A. Why, sure.  Why not?

Q. So the idea of fair market value or fairness was involved in that conversation, too; correct?

A. No, I don't think so.  I think he just mentioned fair market value that time.  He may have mentioned it several times.  We had numerous conversations because through the subdivision as we kept getting bids and stuff and it would sometimes come up, I'm sure.

> Q. <u>Did you tell him that you thought fair market value was fair?</u>
>
> A. <u>I told him that if we could work out a deal, we would sell it to him.</u>
>
> Q. <u>And that fair market value would be okay?</u>
>
> A. <u>That--yes, yes.</u>"  (Emphases added.)

This exchange is far less conclusive than plaintiffs believe.  Kohler denied that fair market value was mentioned at the conversation in spring 1994.  Kohler did acknowledge that fair market value was mentioned in later conversations.  However, the above exchange, and the remainder of Kohler's testimony, shows that Kohler viewed purchase as an alternative to trade rather than as the sole agreed mode of conveyance.

Richard's own testimony suggests that the issue of consideration was not settled at the spring 1994 meeting.  Richard testified that he bid on property at a 1996 auction because he wanted "to be able to work out something that was acceptable to [Kohler], if he wanted to do a trade."  Richard also testified that, if Kohler "wanted to help himself on a trade," he was "more than willing to go along with that."  Later, in May 1999, when Kohler proposed a sale or trade, Richard agreed to a trade without referencing any prior agreement to sell.  (No trade resulted from the May 1999 correspondence because, according to Richard, he and Kohler could not agree on how to compare the properties.)  Plaintiffs assert that "[t]rading property was Kohler's, not [Richard's], idea." Richard, plaintiffs contend, did not himself "shift[] from wanting to buy the [airstrip] to wanting to trade other property for it," but was simply "willing to accommodate Kohler's trade proposal, as long as he acquired the new airstrip in some manner."  Where plaintiffs see Richard's willingness to trade as acquiescence to Kohler's unilateral modification of an agreement to convey by purchase alone, the trial court saw it as evidence that the parties did not agree in the first instance to purchase rather than trade.  We cannot say that the trial court's view is clearly unsupported by the evidence.  If, as

the trial court found, Richard and Kohler did not even agree on whether the conveyance would be by purchase or trade, then clearly "further negotiations" (Milani, 15 Ill. 2d at 430) were necessary before the conveyance could transpire.

It also appears as if the time for performance under the alleged oral contract was practically indefinite, and for this reason also plaintiffs have not proven a contract in unequivocal terms. Plaintiffs contend that there was a "definite date set for closing," that is, it would occur after IDOT approved the airstrip. It was with Richard's "acquiescence" alone, plaintiffs claim, that closing was postponed to late 1998, when Bingham's lease would expire. When 1998 arrived, Kohler "got mad" at Richard and "closed the new airstrip, rather than proceed to closing." Plaintiffs argue that "Kohler's failure to abide by the agreement of the parties to close the sale at the end of 1998 should not be used against [Richard]." According to plaintiffs, Richard "was always ready, willing[,] and able to purchase the new airstrip *** [b]ut was prevented from doing so by Kohler's actions."

The record shows otherwise. Richard's own testimony establishes that, from the making of the alleged contract in spring 1994 to the restoration of the airstrip to crop production in 2002, Richard never demanded performance of Kohler according to the terms of the alleged 1994 contract. In 1995, Richard consented to a three-year postponement of the closing date. The trial court found that Richard's sublease agreement with Bingham was inconsistent with the notion that Richard believed Kohler was contractually obligated to sell to Richard, because Bingham could have refused to renew the year-to-year lease and planted crops on the airstrip. When Kohler closed the airstrip in 1998, Richard made no demand for performance but consented to a lease of the airstrip. In spring 1999, Kohler proposed several options concerning the airstrip, which included two different sale proposals, a trade proposal, and a rent option. Rather than demand that Kohler convey the airstrip by purchase per the alleged spring 1994 contract, Richard sent a note agreeing to a trade (but on

different terms than Kohler proposed). As the trial court noted, Richard's testimony that he thereby "accepted" Kohler's offer diminished his claim to have already had an agreement with Kohler. Richard's means for regaining use of the airstrip was not to demand performance of the alleged 1994 contract but to arrange again for lease of the airstrip. Sometime after April 17, 2000, Richard submitted an appraisal to Kohler but again did not demand performance. Richard continued to rent the airstrip until 2002, when Kohler returned it to production.

David, we recognize, testified that, at his meeting with Kohler in spring 1999, he "tried to write some things down on paper" but Kohler "refused to sign anything." Kohler himself testified of this meeting that David "asked if [Kohler] would sell" the airstrip and that Kohler replied that he would sell "if we could get something worked out but nothing had been worked out yet." Even if David can be said to have spoken for Richard at this meeting (Richard was the only buyer according to plaintiffs' account of the 1994 contract), there is no clear evidence here that David was demanding performance of an existing obligation rather than offering anew to purchase the airstrip.

We agree with defendants that Richard's conduct, even as he described it, was "not the conduct of a man who has made a definite contract to buy property and now sees the other party to the contract renege." While Kohler "could not delay or procrastinate the day of performance indefinitely, at his mere will," neither could Richard "by neglect to demand performance, keep alive the covenant, as a stipulation to be performed at his mere option." Cotton v. Cotton, 75 Ala. 345, 346 (1883).

The case at hand is factually analogous to Roby v. Cossitt, 78 Ill. 638 (1875), where the plaintiff alleged that he had an oral contract to buy land from the defendant. The alleged contract was made on February 15, 1867, and required that the plaintiff pay one-third of the contract price of $52,000 within 40 days and submit the balance in three equal annual installments. The plaintiff

-24-

paid only $500 initially, and, in July 1873, sued the defendant for specific performance. The court denied that remedy, noting that "[a]ll contracts with reference to the sale of land, where time is not of the essence of the contract, must be performed or rescinded within a reasonable time, and if there has been any unusual delay that can not be explained consistently with good faith, equity will hesitate to enforce a specific performance." Roby, 78 Ill. at 644. The court held that the plaintiff was untimely in seeking to vindicate his rights under the alleged contract:

"No sufficient excuse is shown for the unusual delay in attempting to enforce a specific performance of the contract. The vendee has slept on his rights, whatever they may have been, until equity will not interfere in his behalf. Had he intended to insist upon a performance of the agreement, he ought to have filed his bill within a reasonable time, and tendered the purchase money as the several installments matured. This he has not done. In fact, he has done nothing to show readiness and willingness to perform the contract on his part, nor that he had the ability to perform it. But a trifling sum was ever paid to the alleged agent, but complainant asks to obtain the advantage of the immense rise in the value of the property, without having himself performed or offered to perform the contract except in an unimportant part. Had he supposed he had a valid contract with the owner of the property, he ought to have tendered performance, and, if the owner refused to comply on his part, filed his bill at once. After the property has quadrupled in value, equity will not permit him to come forward and have the value of the contract he has not himself offered, within any reasonable time, to perform." Roby, 78 Ill. at 643-44.

There is no allegation here that the airstrip increased in value between spring 1994 and spring 2000, when plaintiffs filed suit, but we do not think the land appreciation in Roby was indispensable to the court's decision. The delay rather was the preeminent concern, and plaintiffs were similarly dilatory

here. Between spring 1994 and spring 2000, Richard consented to a three-year postponement of the closing date plaintiffs claim was originally set, and Richard not only failed to demand performance of Kohler, or tender his own, during the total six-year period, but did not even reference the original contract in May 1999 when Kohler proposed various options with respect to the airstrip. Instead, Richard purported to accept one of the proposed options (trade) that was not consistent with the terms of the alleged 1994 contract (purchase). When negotiations fell through, Richard settled for yet another lease of the airstrip. What constitutes a reasonable time for performance under an oral contract is a question of fact subject to manifest-weight review. Clay v. Harris, 228 Ill. App. 3d 475, 480-81 (1992). The trial court impliedly found that Richard did not demand performance, or tender his own, within a reasonable time, and we see no ground for disturbing that finding. Richard was markedly passive for one supposedly convinced he had rights under an existing contract, especially if he believed performance was due or overdue.

The court, we conclude, did not err in finding that both the price and time-for-performance terms under the contract were indefinite and that there was no enforceable oral contract for the sale of the airstrip.

For the foregoing reasons, we affirm the judgment of the circuit court of De Kalb County.

Affirmed.

ZENOFF, P.J., and HUDSON, J., concur.