2014 IL App (1st) 121662

Nos. 1-12-1662, 1-12-1756 (consolidated)

SIXTH DIVISION
December 19, 2014

IN THE APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| GREGORY BERKOWITZ, as Trustee of the W.F.T. Trust, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellant and Cross-Appellee, | ) ) | |
| v. | ) ) | No. 04 CH 5166 |
| RICHARD J. URSO, JR., as Administrator of the Estate of Richard Urso, Deceased, | ) ) ) | |
| Defendant-Appellee and Cross-Appellant, | ) ) ) | |
| (Banco Popular North America and Unknown Owners, | ) ) | The Honorable Richard J. Billik, Jr., |
| Defendants). | ) | Judge Presiding. |

JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Justices Hall and Rochford concurred in the judgment and opinion.

**O P I N I O N**

¶1      Following a bench trial, the circuit court found that a joint venture agreement existed for the ownership and operation of a rental property between plaintiff, Gregory Berkowitz, as trustee of the W.F.T. Trust (Trust), and Richard Urso (Urso), who had since died. The circuit court, however, found the Trust was barred or precluded from enforcing any claimed right to one-half

of the property interest because the property was acquired *vis-a-vis* a fraudulent or improper purpose and in violation of the Frauds Act (740 ILCS 80/2 (West 1998)).  Notwithstanding, the circuit court concluded that the evidence supported the enforcement of the Trust and Urso's agreement for the operation of the rental property.  The circuit court, therefore, ordered plaintiff and defendant, Richard J. Urso, Jr. (Richard Jr.), as administrator of the estate of Richard Urso, deceased, to wind up the operation of the joint venture arrangement for the rental of the property and to provide an accounting to each other for the operation of the business since Urso's death. The parties have cross-appealed.

¶2     Plaintiff contends the circuit court erred in finding the joint venture agreement for the ownership of the subject property was unenforceable based on an improper or fraudulent purpose and is barred by the Frauds Act.  In contrast, defendant contends the circuit court erred in even finding a joint venture agreement existed.  In the alternative, defendant contends the circuit court erred in finding the joint venture agreement as to the operation of the property, *i.e.*, the renting of the property, was not unenforceable based on a fraudulent or improper purpose, was not barred by the statute of frauds, was not void based on public policy, or was not barred by the Probate Act of 1975 (Probate Act) (755 ILCS 5/18-2, 18-3 (West 1998)).  Based on the following, we affirm in part and reverse in part.

¶3                                      FACTS

¶4     The undisputed facts are these.  In 1998, the subject property, 750 S. Clinton Avenue, in Chicago, Illinois, was purchased.  On April 30, 1998, the title to the property was placed in a land trust with Metropolitan Bank and Trust Company, trust number 2153 (land trust).  The designated beneficiary of the land trust was Urso, having sole power of direction.  The land trust then entered into a mortgage loan agreement with Banco Popular North America (Banco

Popular).[1] The property was leased to Scarlett's G.P., Inc. (Scarlett's), a gentlement's club, for a nine-year term with a five-year option to renew. The May 12, 1998, lease listed the land trust as the landlord with the address of "c/o G.B. Management, 1307 S. Wabash, Suite 200, Chicago, Illinois 60605." The lease contained an "option to purchase" provision, in which Scarlett's had the option to purchase the property until May 31, 1999. In the event Scarlett's wished to exercise the purchase option, pursuant to the terms of the lease, an executed contract was to be sent to "c/o G.B. Management, 1307 S. Wabash, Suite 200, Chicago, Illinois 60605."[2]

¶5    The "buyer's settlement statement," dated July 22, 1998, listed the purchase price of the subject property as $627,500. The settlement statement revealed credits for $25,000 in earnest money, $25,955.17 in tax credits, and $472,500 in loan proceeds. The settlement statement also listed "W.F.T. Contribution,[3] $50,000" as a line item reducing the overall balance required to close the property. The statement listed the "total due from Urso" as $134,769.83.[4] The settlement statement contained a signature line with the name Richard Urso printed below the line and a completed signature on the line. The record contains a copy of a cashier's check dated July 27, 1998, for $50,000 made out to "C. T. and T."[5] with "WFT Trust" as the remitter.

¶6    Urso annually reported the income generated from the property on his personal joint tax returns that he filed with his wife. Urso died on April 15, 2003. As the administrator of Urso's estate, Richard Jr. has acted as the beneficiary of the land trust since the time of his father's death.

---

[1] Banco was dismissed from the underlying lawsuit prior to trial.
[2] The purchase option was not exercised by Scarlett's; the provision is highlighted due to the address listed in the event the option was exercised.
[3] Testimony indicates that W.F.T. Trust stands for Wolf Family Trust.
[4] Another figure for $135,700 is hand written on the signed settlement statement directly below this figure; Wolf testified that Urso contributed $135,700.
[5] Chicago Title and Trust Company.

¶7    On March 24, 2004, plaintiff, as trustee of the W.F.T. Trust, filed suit against defendant alleging that Urso and Louis Wolf, the former trustee of the Trust, entered into an oral joint venture agreement for the purchase and operation of the subject property. The Trust alleged it was entitled to partial ownership and a share in the rents received from the subject property. Plaintiff subsequently filed four amended complaints. In its fourth amended complaint, the subject of which underlies this appeal, the Trust alleged that, in January or early February of 1998, Wolf, acting for the Trust, and Urso verbally agreed to purchase the subject property together. The terms of the agreement were such that the Trust would provide $25,000 in earnest money and an additional $50,000 at the time of closing, while Urso would obtain financing for the property and provide any funds necessary to close over and above the available financing. Moreover, the property would be held in a land trust to which Urso would be the beneficiary. According to the fourth amended complaint, Wolf and Urso agreed that any profits, *i.e.*, the surplus of rents and receipts over the expenses including interest, would be divided and any profits derived from the sale of the property, either by Scarlett's exercising its option to purchase or the ultimate dissolution of the venture, would be divided equally. Defendant filed an answer denying the existence of a joint venture agreement and asserted affirmative defenses based upon illegality/fraudulent purpose, the Frauds Act, the Probate Act, the statute of limitations, and as against public policy. The case proceeded to trial.

¶8    Louis Wolf testified at trial that he started the Wolf Family Trust in 1975. The Trust was involved in all aspects of commercial real estate. Wolf testified that Berkowitz was the trustee of the Trust and Wolf's wife and children were the named beneficiaries. Wolf said that he acted on behalf of the Trust in the acquisition of properties and all negotiations related thereto.

¶9      Wolf testified that he met Urso in 1995.  Urso was a neighbor and became a close friend. According to Wolf, he and Urso had a business relationship for the acquisition of real estate. Specifically, Wolf and Urso purchased three parcels of property together: one on Clark Street, one on Harlem Avenue, and the subject property.  The owners of the Clark Street property were Wolf, Urso, and Albert Berland, who had since passed away.  Wolf testified that he could not recall who held title to the Clark Street property, but he knew that neither he nor the Trust were named on the title.  Wolf said that they held the Clark Street property for three or four years before selling it and splitting the proceeds equally amongst the three men.  Wolf testified that there was no written agreement related to the Clark Street property.  According to Wolf, he and Urso purchased the Harlem Avenue property in 2002.  Wolf and Urso each contributed half of the purchase price, but title was held by a corporation to which Urso controlled the ownership shares.  Wolf testified that he and Urso had the Harlem Avenue property for "several years and then Mr. Urso sold the property."  Wolf and Urso split the proceeds equally.  There was no written agreement attached to the Harlem Avenue property.

¶10     Wolf additionally testified that in 1998 he learned of the subject property.  Mark Vajdik, operator of Scarlett's, suggested Wolf purchase the property because, as the lessor of the premises, Vajdik was having issues with the owner at the time.  After viewing the property, Wolf told Vajdik that he was interested in purchasing the parcel.  As a result, Wolf began negotiating a lease with Vajdik.  While negotiating the lease, Wolf contacted Daniel Kravetz, whom he had known for 15 years, to inquire if Kravetz was interested in partnering on the deal.  Wolf also retained the services of attorney Charles Goodbar.  Wolf provided Goodbar with a $25,000 check from the Trust for purposes of earnest money.  Meanwhile, Kravetz contacted Larry Slonina, a loan officer at Banco Popular, in an effort to obtain a loan to purchase the subject property.

According to Wolf, he and Kravetz planned to be equal owners of the subject property, but Kravetz was going to hold title and obtain the loan in Kravetz's name only.

¶11    Wolf testified, however, that Kravetz met him and a group of men for a weekly breakfast meeting at which time Kravetz told Wolf that he could not proceed with the deal.  Kravetz was in the currency exchange business and his partners in that business had a problem with Kravetz entering a partnership for the purchase of the subject property.  Urso attended the breakfast as well and expressed interest in taking over Kravetz's position in the deal.  Specifically, Urso would become an equal partner with Wolf in the transaction and would proceed to get financing.  Wolf testified that Urso ultimately signed the lease agreement as the landlord.  According to Wolf, the Trust contributed $75,000 to the purchase of the subject property and Urso contributed $135,700.  Wolf acknowledged that the settlement statement did not expressly denote that the Trust contributed $25,000 for earnest money.  Rather, there was no identifiable source for the $25,000 listed on the settlement statement.  Moreover, Wolf acknowledged that the $50,000 line item from the Trust was not designated as a contribution to the partnership.  Wolf testified that Goodbar represented both the Trust and Urso at the closing for the property.

¶12    Wolf acknowledged that Urso was named as the beneficiary of the land trust, which held title to the subject property.  Wolf stated that he was not named on the title of the property because, at the time, he "had several judgments against [him] that [he] was paying on.  And [he] didn't want to complicate financing."  According to Wolf, if the Trust was on the title "there would be a problem."  In particular, Wolf had a judgment against him for $2.2 million related to an Environmental Protection Agency violation concerning one of his properties and a judgment against him for $1.8 million related to a property tax violation related to another of his properties.

¶13    Wolf testified that, after its purchase, he visited the subject property several times.  On one occasion, Wolf introduced Vajdik to Urso and directed him to pay rent to Urso.  Wolf added that he went to the property once or twice because the lessee was not making the proper payment to cover the tax escrow.  Wolf also visited the property to collect rent on one occasion after Urso's death.  Wolf forwarded the rent check to defendant because Richard Jr. was managing the property and collecting rent after Urso's death.  Wolf believed that defendant had taken the place of Urso in managing the subject property on behalf of the partnership.  Wolf admitted that no written partnership agreement existed for the subject property, but maintained that there was an oral partnership agreement.

¶14    Wolf further testified that in August 2000 Berkowitz sent Urso a letter to obtain an accounting of the rent from the subject property for purposes of income taxes.  Wolf added that he subsequently sent Goodbar a facsimile stating:

> "I spoke to Mr. Urso after Greg had a problem with him regarding partnership returns.  He advised me as to the closing statement, just how much I owe to him for my fifty percent interest.  And I will bring you a check for the W.F.T. interest in this property.  I have asked Urso on three occasions to give me that figure with no success.  After his conversation with Greg I want this matter to be disposed of one way or another."

According to Wolf, he annually reported an interest in the subject property on his "Schedule E" tax return.  The returns do not appear in the record.

¶15    Gregory Berkowitz testified that he was a licensed real estate broker and the trustee for the W.F.T. Trust, but not the beneficiary of the Trust.  Berkowitz was also the president of GB Property Management, Inc., which managed Wolf's properties.  Berkowitz testified that he

managed the real estate for the Trust and handled the maintenance for the Trust's buildings. According to Berkowitz, the Trust had "well over 100 pieces of property." The Trust maintained office space, first at 1307 South Wabash Avenue in Chicago, Illinois, and later at 770 North LaSalle Street in Chicago, Illinois. Berkowitz had known Wolf since Berkowitz was a teenager and began working for him in 1984. Berkowitz said he met Urso when he started working for Wolf. Berkowitz described Wolf and Urso as old friends and neighbors with a business relationship. The office had business records for the properties in which Wolf or the Trust held an interest. According to Berkowitz, the Trust's accountant advised the Trust not to file tax returns.

¶16    Berkowitz testified that he personally owned eight or nine properties with Wolf. Berkowitz stated that Wolf or the Trust had a number of properties, other than the subject property, for which he was not of record but claimed an interest. For example, "dealings with Dan Kravetz where [Wolf] had an ownership interest in properties that were not—and his interest was not of record, as well as Richard Urlich. Same scenario. And even an instance where [Wolf] and [Berkowitz] had a property together where [Wolf's] interest was not of record." The property Berkowitz owned with Wolf was located in Florida. Wolf had an 80% ownership interest, but he was not the owner of record. Berkowitz testified that there was a loan obtained for the property through Slonina at Banco Popular.

¶17    In relation to the subject property, Berkowitz testified that he did not have a personal interest. Based on conversations with both Wolf and Urso, Berkowitz understood that Wolf and Urso were equal partners in the acquisition of the subject property. Berkowitz testified that Wolf provided $25,000 as earnest money for the subject property. After the property was acquired, title was held in a land trust with Urso as the beneficiary pursuant to the agreement between Urso

and Wolf. Urso received the rental payments from the lessee. Berkowitz testified that the Trust's office maintained documentation related to the subject property. According to Berkowitz, the file for the subject property contained a letter addressed to Urso dated August 17, 2000. The letter was prepared by Berkowitz on behalf of the Trust. The letter claimed that the Trust had 50 percent ownership of the subject property. Over defense counsel's objection based on the Dead Man's Act, Berkowitz testified that Urso never responded to the letter. According to Berkowitz, the letter was sent after a conversation with the Trust's accountant. Berkowitz was attempting to compile documentation to accurately show the Trust's 50% interest in order to document the property on Wolf's tax return. Berkowitz testified that Wolf had an "active role in the management" of the subject property. Berkowitz stated that he arranged to have his "roofing people repair the roof" of the subject property at the request of Wolf. Berkowitz, however, admitted that in his deposition testimony he testified that he never got involved in the maintenance of the subject property. Berkowitz later testified that, during his deposition testimony, he failed to recall the roof repair of the subject property, but had since been reminded of it.

¶18 Berkowitz further testified that Wolf and Urso partnered on a property on Harlem Avenue in Bedford Park. According to Berkowitz, he learned from Wolf that the Harlem Avenue property subsequently was sold and Wolf and Urso split the funds equally.

¶19 Mark Vajdik testified at trial that he negotiated the terms of his lease of the subject property with Wolf. Initially, Vajdik sent his rent payments to "GB Management," which he understood was "the operating entity for" the Trust. Vajdik testified that Wolf introduced him to Urso in 1998, sometime after the closing on the property. According to Vajdik, Wolf and Urso held themselves out as partners. After meeting Urso, Vajdik was instructed to direct all building

9

related issues, such as repairs, to Wolf and to remit all rent payments to Urso. Vajdik then sent rent payments to Urso. In addition, Vajdik testified that he called Wolf when the roof leaked at the property and Wolf provided roofers to repair the damage.

¶20    Daniel Kravetz testified that he had a professional and personal relationship with Wolf. In their first business relationship, Kravetz and Wolf purchased a building together in 1987 or 1988. Kravetz was responsible for the loan. Wolf's name did not appear on the loan. Kravetz testified that he and Wolf were equal partners, providing some of their own money as equity and borrowing the rest in the form of a mortgage that was eventually satisfied. According to Kravetz, he and Wolf initially did not memorialize their partnership agreement, but did so sometime after 2000. Kravetz testified that he and Wolf were involved in the ownership of several properties.

¶21    According to Kravetz, Wolf approached him in 1998 with a business opportunity to purchase the subject property together. The terms of the agreement were that Kravetz and Wolf would each contribute at least $100,000 to purchase the $800,000 building and act as equal partners. Kravetz, however, would hold title in his name alone or in the name of one of Kravetz's entities, and Kravetz would obtain the loan for the property. After performing his "due diligence" by inspecting the property, Kravetz informed Wolf that he was interested in moving forward with its purchase. Kravetz contacted Slonina, with whom he had an established relationship as a "preferred borrower." Kravetz testified that he informed Slonina that Wolf was involved in the purchase of the subject property, but that Kravetz would be responsible for the loan.

¶22    Kravetz, however, said he ultimately stepped away from the deal because his partners in another line of business did not want him to become a landlord for a gentlemen's club. Kravetz

testified that, at that time, he attended weekly lunch gatherings on Sundays at the Atrium Restaurant located on the corner of Monroe Street and Wacker Drive in Chicago. The following Sunday, his group, including Wolf, Urso, the owner of the restaurant, and a man that has since died, gathered and the subject property was discussed. Urso expressed a desire to purchase the subject property. According to Kravetz, Wolf stated that Urso would step into Kravetz's shoes in the deal as an equal partner. Kravetz replied that he had to inform Slonina that he was no longer interested in proceeding with purchasing the property and instead he would recommend that the bank extend a loan to Urso. Kravetz completed the phone call to Slonina, and Slonina advised Kravetz to have Urso call Slonina. Thereafter, Kravetz was no longer involved in the acquisition of the subject property.

¶23    Charles Goodbar testified that in February 1998 he issued a $25,000 check on behalf of Wolf to the seller's attorney for earnest money for the subject property. The check, however, was returned in late February 1998 or early March 1998 because the sale of the property fell through. According to Goodbar, Wolf then returned to Goodbar's office sometime in May 1998 with an executed purchase and sales agreement for the subject property, along with a lease. Wolf set up a meeting between himself, Urso, and Goodbar. During the meeting in May 1998, Wolf introduced Goodbar to Urso. In Goodbar's presence, Wolf asked Urso whether he would like to purchase the subject property together and to partner in leasing the property. Urso replied in the positive. Goodbar testified that he considered himself to represent the partnership between Wolf and Urso. At the meeting, Wolf and Urso decided the subject property would be vested in a land trust with Urso as the sole beneficiary "so they could attempt to get a loan." They discussed contacting Slonina at Banco Popular to obtain the loan. Goodbar testified that Wolf did not want

to be named in conjunction with the property because the property had a special use license issued by the city of Chicago.

¶24 When asked whether Urso was the "only buyer" of the subject property, Goodbar responded in the negative. Goodbar elaborated:

> "Mr. Wolf was not involved as beneficiary of the land trust. Mr. Wolf was not involved in the application.
>
> ***
>
> Mr. Wolf was involved in the negotiation of the lease. Mr. Wolf was involved in putting the deal together.
>
> I do not know who made the earnest money deposit. Mr. Wolf attended the closing. And as we discussed, Mr. Wolf made a deposit at closing towards the downpayment of the property."

Goodbar admitted that Urso was his only client in terms of taking title as a beneficiary of the land trust and applying for the loan to purchase the subject property. According to Goodbar, Wolf and Urso both attended the closing of the subject property. The Chicago Title and Trust settlement statement listed three deposited checks: one from the Wolf Family Trust for $50,000, one from Urso for $25,000, and one from an unnamed source for $25,000. Goodbar testified that he signed the settlement statement as the buyer with permission from Wolf and Urso.

¶25 According to Goodbar, neither Wolf nor Urso requested that the terms of their partnership be reduced to writing. Goodbar understood that Wolf and Urso were equal partners, but he did not know the details of the partnership. Goodbar testified that he had a series of conversations with Wolf and Urso at the end of 2002 and in early 2003 "to try to determine the amount of capital each partner had in their account." Goodbar prepared a document "at the

direction of Mr. Wolf of putting the numbers together." According to Goodbar, there was an issue regarding who provided the $25,000 in earnest money for the property. Both Wolf and Urso claimed to have provided the $25,000 earnest money, but neither could produce a canceled check to substantiate his claim. Goodbar testified that Urso borrowed $468,237.50 from Banco Popular to purchase the property. The loan was guaranteed by Urso only.

¶26    Goodbar further testified that Wolf and Urso partnered on another real estate purchase after the subject property, sometime in 1999, 2000, or 2001. The property was on Harlem Avenue in Bedford Park, Illinois, and title was purchased by a corporation with Urso as the sole stockholder. The corporation was the borrower in the acquisition. According to Goodbar, the Bedford property was sold approximately 15 months after it was purchased and the proceeds were divided equally by Wolf and Urso. Wolf and Urso did not have a written agreement for the Bedford property venture.

¶27    Larry Slonina testified that, in 1998, he was a senior vice president at Banco Popular. His duties included those of a commercial loan officer, in that he analyzed loan applications for creditworthiness. According to Slonina, a creditworthiness assessment included a cash flow analysis, as well as performing a search for liens, pending lawsuits, or judgments against the applicant. Slonina testified that he was the loan officer for Urso's loan application for the subject property. Slonina testified that Kravetz introduced him to Urso. Kravetz was an individual with whom Slonina had conducted business previously. Urso's loan application provided that the primary source of repayment for the loan was rental payments on the property and the secondary source was Urso. Wolf's name did not appear on the application. The loan application contained a section entitled "monitoring covenants," which listed three documents that Urso was obligated to provide on an ongoing basis, namely, annual operating statements of the building, annual

compiled statements of one of Urso's business entities, and Urso's annual personal financial statements and tax returns. No assets or contributions by Wolf or the W.F.T. Trust were included on the loan application. According to Slonina, the land trust and Urso were the borrowers on the promissory note provided to Banco Popular. A mortgage document was executed by Slonina with the land trust and Urso: the mortgagor was the land trust with Urso as the sole owner of the beneficial interest of the land trust. Slonina did not attend the closing for the subject property.

¶28     Larry Starkman testified that he was a real estate appraiser, broker, manager, and developer. Starkman was longtime friends with both Wolf and Urso. Starkman testified that he presented Wolf and Urso with the opportunity to purchase the property located at 6375 Harlem Avenue in Bedford Park, Illinois. Starkman acted as the real estate broker in the purchase. For that property, Urso borrowed the money for the deal. When Wolf and Urso sold the property, Starkman again acted as the real estate broker. According to Starkman, both Wolf and Urso paid Starkman's $25,000 commission for the sale. Starkman assumed the remaining gain from the sale "was divided equally between the two." Starkman discussed the equal partnership with both Wolf and Urso in separate conversations.

¶29     Starkman testified that he participated in weekly lunches with Wolf, Urso, Kravetz, and others. According to Starkman, the lunches occurred on recurring Saturdays and took place in various restaurants. Starkman recalled Wolf discussing the terms of the deal with the subject property over the course of a number of lunches. According to Starkman, Kravetz was initially linked to the deal with Wolf, but it "evolved" into Urso "doing the deal with" Wolf. Starkman testified that Urso said "it sounded like an excellent deal and he would love to be a partner." According to Starkman, it was a "common practice" for Wolf not to be included in the financing

on his property acquisition deals. Starkman understood that Wolf did not want to be named on the title or financing for the subject property because there were outstanding judgments against him and because of the notoriety of the property lessee. During the lunches, Wolf also expressed concern with linking his name to the subject property because the city of Chicago was involved and concerned with a liquor license for the premises and because the property had a special entertainment license. After the subject property was purchased, Starkman said Urso was tasked with the day-to-day management while Wolf maintained an advisory role. According to Starkman, "Wolf was always advising. Richard Urso had great respect for Lou's opinion. *** [Wolf] had nothing to do with bookkeeping, but I think any decisions that came up *** [Wolf] primed [Urso's] decisions. [Urso] really relied on [Wolf] for advice like that. And [Wolf] had excellent judgment when it came to these types of transactions dealing with the tenants."

¶30    Starkman further testified that he regularly appraised properties for Wolf. Starkman also appeared as an expert witness on Wolf's behalf. In a bankruptcy proceeding, Starkman testified regarding the value of 10 parcels of property to which Wolf did not hold title but claimed an interest.

¶31    Joanne Urso, the decedent's wife, testified that the subject property was owned by the land trust. According to Joanne, she filed joint tax returns with her husband and in the years from 1998 until 2001 the returns included the subject property. Joanne had no knowledge that the Trust had an ownership interest in the subject property.

¶32    Richard Jr. testified that, prior to Urso's death, he picked up rent checks at the subject property "probably about fifteen or twenty times and paid the real estate taxes on the property." Richard Jr. testified that the rent checks were made payable to "750 South Clinton," the address of the property. Richard Jr. said he gave the rent checks to Urso, never to Wolf, Berkowitz, or a

15

representative of W.F.T. Trust. Richard Jr. testified that he was unaware of anyone claiming a partnership interest in the subject property. After Urso's death, Richard Jr. collected the rent checks from the subject property, paid the mortgage and real estate taxes, and was in charge of building maintenance. Richard Jr. never consulted with Wolf, Berkowitz, or any representative of the Trust regarding those activities. According to Richard Jr., Banco Popular decided not to renew the mortgage on the subject property and the mortgage was taken over by Mutual Bank. Neither Wolf, Berkowitz, nor any representative of the Trust were consulted regarding the purchase of the mortgage. Richard Jr. testified that the mortgage had since been paid off.

¶ 33    In its written order, the circuit court concluded, in part:

"Under either a preponderance of the evidence or a clear and convincing standard, the evidence has shown that Wolf and Urso intended to enter into an arrangement to acquire and operate the Property. The Trust has demonstrated that Wolf and Urso reached an understanding regarding the Property, even though the evidence indicates that after the acquisition, there were certain unresolved matters that arose, including whether the Trust paid a total of $50,000 or $75,000 at or prior to the closing on the Property.

* * *

Urso, Jr. has not rebutted the showing made by the Trust that an understanding was reached and it ripened into the Agreement regarding the Property. Notwithstanding, Urso, Jr. has asserted affirmative defenses and other matters in an attempt to bar the enforcement of the Agreement.

The Trust is asking this court to order the sale of the assets of the venture, including the Property, even though neither the Trust nor any entity comprising

the venture holds title to the Property, owns or holds a beneficial interest under the land trust that does hold title to the Property or has proven a contractual right under any writings signed by Urso to require Urso, Jr. to sell the Property in order for the Trust to receive an equal share of the proceeds of the sale. Both Wolf and the Trust, who had access to Attorney Goodbar, could have arranged for the preparation of the necessary documentation to create an entity or a venture to take title or hold title to the Property. Wolf and the Trust, who had access to Attorney Goodbar, could have arranged for either of them to be placed on title or be designated as beneficiary under the land trust with Urso, but they chose not to do so. Wolf and the Trust could have had a written agreement prepared evidencing the oral understanding they assert the parties had with respect to [the] Trust's claimed right to an interest in the Property with Urso, but Wolf and the Trust did not do that either. The only reasonable evidentiary inference is that such action was not taken by Wolf and the Trust in order to conceal or not disclose the claimed right they now assert to an interest to the Property or to the proceeds of its sale.

Urso, Jr. has shown that any term or understanding in the Agreement to acquire the Property in such a manner so as not to disclose the claimed interest that Wolf and his Trust are now asserting in the Property sought to 'accomplish an improper or fraudulent purpose' and is unenforceable for certain reasons argued by Urso, Jr. ***

*  *  *

17

The evidence and reasonable inferences therefrom demonstrate that the manner in which the Property was acquired and maintained, titled not in the name of the Trust or in a venture identifying the Trust or Wolf, and the loan secured, through the name of Urso only, served an 'improper' or 'fraudulent' purpose as the record shows that there was an effort to keep the Property out of reach from the judgment creditors and an effort to facilitate the issuance of licenses from the City of Chicago for the Property's operation. In view of these circumstances that have support in the record, the Trust's pursuit of an order under the Agreement to require a sale of the Property to allow for a distribution of the proceeds to the Trust as if it held a right to an interest in the Property that the Trust is claiming has not been shown to be justified and the term of the Agreement that the Trust is relying upon to claim such relief cannot be enforced on such a deceptive or improper premise. ***

Urso, Jr. seems to advocate the position that under the circumstances presented in this record that a court of equity 'should leave the parties where it finds them.' *** After considering Urso, Jr.'s position, this court finds that after Urso's death, Urso, Jr. is the holder of the beneficial interest of the land trust that holds title to the Property and that neither the Trust nor any venture is so named in the land trust. This court further finds that the parties should be left to the arrangement of operating the business as the Property together under the Agreement. *** The parties' arrangement under the Agreement has involved, the leasing of the premises. ***

The contention raised by Urso, Jr. that 'the purported agreement between Wolf and Urso is not severable and should not be enforced' for purposes of fashioning a remedy has not been shown to be convincing. *** The evidence adduced as trial substantiated the operation and management of the Property under such an understanding. The record simply does not support Urso, Jr.'s contention that the parties' arrangement to operate the business at the Property together cannot be treated separately from the Trust's claim right to share in the proceeds from the sale of the Property because of an alleged interest in it. ***

* * *

The evidence has established that Wolf for his benefit and acting on behalf of the Trust reached an oral understanding with Urso regarding the joint operation of the business at the Property, that has involved the leasing of the premises to a tenant. With respect to the operation of the business at the Property, the Trust is entitled to a dissolution of that arrangement in view of Urso's death. ***

The Trust and Urso, Jr. shall wind up the operation of the business at the Property that both the Trust and Urso agreed to operate jointly, unless Urso, Jr. and the Trust consent in writing and present a proposed agreed order regarding the same to the court ***. In connection with the winding up process, the parties shall take account of each other for operation of the business at the Property since Urso's death. However, the $75,000 in payments the Trust made in 1998 shall be taken into consideration for purposes of the accounting."

¶34    With regard to Richard Jr.'s affirmative defense of the statute of frauds, the circuit court found that Wolf's and Urso's acquisition of the property was unenforceable as a violation of the

19

Frauds Act, but that the Frauds Act did not bar the arrangement involving the operation of the rental property. The circuit court denied Richard Jr.'s remaining affirmative defenses based on violations of the federal banking law, the Probate Act, and the statute of limitations. The parties have cross-appealed.

¶35                                    ANALYSIS

¶36     We immediately turn to the issues related to the Frauds Act, as they are dispositive to the case. The Trust contends that the circuit court erred in finding that the acquisition of the subject property was barred by the Frauds Act. Richard Jr., on the other hand, contends the circuit court erred in finding the operation of the oral rental agreement for the subject property was not barred by the Frauds Act.

¶37     The Frauds Act provides:

> "No action shall be brought to charge any person upon any contract for the sale of
> lands, tenements or hereditaments or any interest in or concerning them, for a
> longer term than one year, unless such contract or some memorandum or note
> thereof shall be in writing, and signed by the party to be charged therewith, or
> some person thereunto by him lawfully authorized in writing, signed by such
> party." 740 ILCS 80/2 (West 1998).

The supreme court has advised that "Illinois' statute of frauds seeks to do the same [as the English statute enacted by Parliament] by barring actions based upon nothing more than loose verbal statements." *McInerney v. Charter Golf, Inc.*, 176 Ill. 2d 482, 489 (1997). The supreme court further advised:

> "The period of one year, although arbitrary, recognizes that with the
> passage of time evidence becomes stale and memories fade. The statute proceeds

from the legislature's sound conclusion that while the technical elements of a

contract may exist, certain contracts should not be enforced absent a writing. It

functions more as an evidentiary safeguard than as a substantive rule of contract.

As such, the statute exists to protect not just the parties to a contract, but also-

perhaps more importantly-to protect the fact finder from charlatans, perjurers and

the problems of proof accompanying oral contracts." *Id.*

The interpretation of a statute is a question of law that we review *de novo*. *Lucas v. Lakin*, 175 Ill. 2d 166, 171 (1997).

¶38     The Trust argues that there were two writings signed by Urso that satisfy the Frauds Act. In particular, the settlement statement, signed by Urso, reflected the Trust's $50,000 "contribution" to the purchase of the subject property, and the lease, also signed by Urso, listed the office of the Trust as the location for rental payments and for the exercise of the lease's purchase option. According to the Trust, the evidence demonstrated that the subject property was purchased by the Trust and Urso for profit after they entered into a joint venture agreement, which does not violate the Frauds Act.

¶39     In order for a writing to satisfy the statute of frauds, the writing must demonstrate the existence of a contract and contain all of its essential terms and conditions. *Storm & Associates, Ltd. v. Cuculich*, 298 Ill. App. 3d 1040 (1998). Neither of the writings in this case satisfies the statute of frauds. The $50,000 "contribution" remitted by "W.F.T. Trust" listed "C.T. and T," *i.e.*, Chicago Title and Trust, as the recipient of the funds. The settlement statement provided a $50,000 line-item credit recorded as "W.F.T. Contribution." No other information regarding the alleged contract was contained within the settlement statement. With regard to the second writing, the lease listed the land trust

as the landlord, but provided the address of "c/o G.B. Management, 1307 S. Wabash, Suite 200, Chicago, Illinois 60605" for the remission of rental payments and for the exercise of the purchase option. However, other than the address, which plaintiff contends was the address for the Trust's property management company, there was absolutely no information demonstrating a connection between the property and the Trust, let alone the existence of the alleged contract or its terms and conditions. As a result, neither of the writings supports the Trust's position that the parties' intent to establish a joint venture to own and operate the property was clearly demonstrated *vis-a-vis* the settlement statement and the lease.

¶40 The basic facts of this case are similar to those in *Morton v. Nelson*, 145 Ill. 586 (1893). In *Morton*, the two plaintiffs alleged that they and the defendant entered an agreement for the purchase of a parcel of land and the erection of a building for which the parties were to share equally in the net profits. *Id*. at 591. The land was purchased by and deeded solely to the defendant, as was the case for the subject property. *Id*. Unlike in our case, though, the evidence demonstrated that the plaintiffs in *Morton* did not "advance[] a single dollar in payment of the purchase money, or in payment of the cost of the building" and, therefore, the supreme court found there was not a partnership between the parties. *Id*. at 591-92. Notwithstanding, the plaintiffs alleged the parties had a verbal agreement wherein the defendant was to deed or execute and deliver a declaration of trust to invest each of the three men in one-third interest in the property. Turning to the statute of frauds defense advanced by the defendant, the supreme court concluded the alleged verbal agreement was unenforceable because it related to the sale of or interest in land, which, under the statute, required a writing signed by the party alleged to have made the

agreement, *i.e.*, the defendant, and no such writing existed. *Id*. at 593. "[A] verbal agreement to purchase land for the benefit of another is void under the Statute of Frauds, and can not be enforced against a purchaser who, in the absence of fraud, has paid for the land with his own money, and taken a conveyance in his own name." *Id*. at 593-94 (citing *Stephenson v. Thompson*, 13 Ill. 186, 188 (1851)).

¶41     We acknowledge that, in the case at bar, the circuit court found the Trust contributed $75,000 to the purchase of the property; however, Urso purchased the property by receiving $472,500 in financing for which he was solely responsible, as well as contributing approximately $135,000 of his own money. The ownership of the property was placed in the land trust for which Urso was the sole beneficiary. Therefore, Urso financed the vast majority of the purchase price in his name alone and owned the property in his name alone. In order to avoid the statute of frauds, the Trust was required to advance a written document evidencing the alleged oral contract, which, as stated above, the Trust failed to provide.

¶42     More recently, the Second District stated that "Section 2 [of the Frauds Act] does not govern a joint venture agreement if the partnership engages in the purchase or sale of real property that is owned by the partnership. However, the statute is applicable to the joint venture agreement if the partners agree to share the proceeds of a sale of land that is owned by one partner alone." *B&B Land Acquisition, Inc. v. Mandell*, 305 Ill. App. 3d 1068, 1073 (1999) (citing *Goldstein v. Nathan*, 158 Ill. 641, 646-47 (1895)). In this case, the alleged partnership did not purchase the property. Instead, the Trust merely *contributed* a small percentage of the purchase price. Moreover, the property was not

owned by the alleged partnership. Urso was the sole beneficiary of the land trust. As a result, the statute of frauds applied.

¶43    In the alternative, the Trust contends the Frauds Act does not apply where it fully performed under the oral contract. According to the Trust, the agreement at issue was for the purchase and leasing of the subject property. The Trust argues it fully performed because Wolf found the property, negotiated its purchase and the lease thereof, contributed the "agreed amount" toward the purchase, and "helped with the collection of rent and repairs."

¶44    We recognize that there is an exception to the statute of frauds' writing requirement where one party completely performs under a contract (*Anderson v. Kohler*, 397 Ill. App. 3d 773, 785 (2009)); however, we find the exception does not apply in this case. Based on the trial testimony, Wolf chose the subject property and negotiated its purchase and lease prior to entering into the alleged oral agreement with Urso. As a result, these actions were not performed in furtherance of completing an agreement that had not yet been made. Moreover, the Trust's contribution to the purchase price does not constitute full performance rendering the Frauds Act inapplicable. See *Cain v. Cross*, 293 Ill. App. 3d 255, 259 (1997) (partial payment for the purchase of a property is insufficient to bar application of the Frauds Act). Finally, the trial testimony demonstrated that Wolf had little involvement in the operation of the subject property during Urso's lifetime and had no involvement when Richard Jr. took over the operation. Overall, we cannot say the Trust fully performed under the alleged oral agreement.

¶45    We further conclude that the circuit court erred in finding the alleged oral agreement to operate the subject property did not violate the statute of frauds. Without

providing any reasoning, the circuit court held that the Frauds Act did not bar the Trust's ability to enforce the alleged oral arrangement involving the operation of the subject property. The circuit court's ruling that the Trust was entitled to an interest in the rents received from leasing the property directly conflicts with its ruling that the Frauds Act barred the Trust from exercising an ownership interest in the property. The Frauds Act requires a writing for agreements involving real property and the rights associated therewith. More specifically, the Frauds Act provides that "[n]o action shall be brought to charge any person upon any contract for the sale of lands, tenements or hereditaments or any interest in or concerning them" unless there is a writing signed "by the party to be charged therewith." 740 ILCS 80/2 (West 1998). The right to collect rent has long been established as a right of property ownership. The collection of unaccrued rents is an incorporeal hereditament that passes with the sale or devise of land. *Lipschultz v. Robertson*, 407 Ill. 470, 474 (1950); see Black's Law Dictionary 794 (9th ed. 2009) (incorporeal hereditament is defined as "[a]n intangible right in land" and rent is listed as a type in common law). Indeed, it has been determined that hotel receipts constitute rent and, therefore, are an interest in real property. *Travelers Insurance Co. v. First National Bank of Blue Island*, 250 Ill. App. 3d 641, 645 (1993). In sum, the right to receive collected rents is incident to ownership and, therefore, is governed by the statute of frauds. Because there was no writing demonstrating any agreement for collecting rents on the property, the alleged oral agreement is barred by the Frauds Act.

¶46                             CONCLUSION

¶47     We conclude that the alleged oral agreement for the ownership and operation of the subject property was precluded by the Frauds Act. We, therefore, affirm the circuit court's

25

judgment that the Trust was barred from enforcing a one-half property interest in the subject property; however, we reverse the circuit court's judgment finding that the Trust was entitled to enforce an interest related to the leasing of the subject property.

¶48    Affirmed in part and reversed in part.