NOTICE
Decision filed 10/02/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 240826-U

NO. 5-24-0826

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| AMY J. HOHLBAUGH, Independent Administrator of the Estate of Kevin Lee Hohlbaugh, Deceased, | ) ) ) | Appeal from the Circuit Court of Wayne County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 21-CH-1 |
| KENNETH D. HOHLBAUGH, BARBARA S. HOHLBAUGH,* and KBK LLC, an Illinois Limited Liability Company, | ) ) ) ) | Honorable Mark L. Shaner, |
| Defendants-Appellees. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Justices Moore and Boie concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The judgment of the circuit court as to count I of the complaint is reversed where the plaintiff met her burden to establish that the Estate is the transferee of Kevin's distributional interest in KBK, and the cause is remanded with directions. The judgment of the circuit court as to count II of the complaint is affirmed where the plaintiff failed to meet her burden to establish an enforceable oral contract for deed.

¶ 2    The plaintiff, Amy J. Hohlbaugh, Independent Administrator of the Estate of Kevin Lee Hohlbaugh, deceased (Estate), filed a complaint for declaratory relief against the defendants,

_____

*Barbara S. Hohlbaugh died during the pendency of this appeal. Kenneth D. Hohlbaugh, Personal Representative of the Estate of Barbara S. Hohlbaugh, has been substituted as appellee pursuant to Illinois Supreme Court Rule 366(a)(2) (eff. Feb. 1, 1994).

1

Kenneth D. Hohlbaugh, Barbara S. Hohlbaugh,[1] and KBK LLC, an Illinois limited liability company (KBK). In count I, the plaintiff sought an order declaring that Kevin's estate was the transferee and owner of one-third of the membership interest in KBK. In count II, the plaintiff sought an order declaring the rights of the parties as to the existence of an oral contract for deed between the defendants, Ken and Barbara, and their son, Kevin, for the sale of real estate located in Greenup, Illinois, and the rights of the parties as to legal and equitable title to that real estate. Following a bench trial, the circuit court entered a judgment against the plaintiff and in favor of the defendants on each count of the complaint. The plaintiff appealed. We affirm in part and reverse in part.

¶ 3                                    I. BACKGROUND

¶ 4      Defendant KBK is a limited liability company that was organized on May 18, 2001. Ken, Barbara, and their son, Kevin, were the original members of KBK. Kevin died on April 21, 2020. Kevin's surviving spouse, Amy J. Hohlbaugh, is the independent administrator of Kevin's estate. Following Kevin's death, a dispute arose between the parties over two distinct property interests.

¶ 5      On January 26, 2021, the plaintiff filed a two-count complaint for declaratory relief against Ken, Barbara, and KBK. According to the allegations in count I, KBK's articles of organization were filed with the Illinois Secretary of State on May 18, 2001. The articles of organization designated Ken, Barbara, and Kevin as the only members of the company. KBK did not have a written operating agreement governing the conduct of the company and the rights and responsibilities of its members. On June 18, 2003, Ken filed KBK's articles of amendment that purported to withdraw Kevin as a member. The plaintiff further alleged that notwithstanding

---

[1]In briefing before this court, the parties have referred to the individual defendants and the decedent by their first names. For consistency, the reference to the individual parties by first names is retained in this order.

Kevin's purported withdrawal, KBK, at the direction of Ken and Barbara, distributed a portion of KBK's income to Kevin from 2013 until his death in 2020. The plaintiff asserted that under section 35-45 of the Limited Liability Company Act (Act) (805 ILCS 180/35-45 (West 2002)), Kevin was not dissociated as a member of KBK, until his death, and therefore Kevin's one-third interest in KBK was transferred to his estate. The plaintiff sought a declaration that the Estate, as transferee, was the owner of one-third of the membership interest of KBK.

¶ 6        In count II of the complaint, the plaintiff alleged that on May 31, 2013, Ken and Barbara entered into an oral contract for deed with Kevin. Under the terms of the oral agreement, Ken and Barbara agreed to sell a commercial property in Greenup, Illinois (Greenup property), to Kevin, for the price of $265,000, payable in 152 consecutive monthly payments of $2,000, with an interest rate of 2.25% per annum. The monthly payments were to begin on June 30, 2013, with a final payment of $926.95 due on February 28, 2026. The plaintiff further alleged that in reliance on the oral contract for deed, Kevin paid 59% of the principal purchase price and $33,667.72 in interest, for a total of $189,812,64, over the course of seven years, and thereby partly performed his obligations under the oral contract for deed. The plaintiff asked the circuit court to determine and declare the rights of the parties as to the existence and validity of an oral contract for deed to the Greenup property and the equitable and legal title to that property.

¶ 7        The defendants filed a motion to dismiss the complaint, asserting that count I was barred by the statute of limitations and the doctrine of *laches*, and that count II was barred by the statute of frauds. The circuit court found there were unresolved factual issues in dispute and denied the defendants' motion. Subsequently, the defendants filed an answer and affirmative defenses. As to count I, the defendants denied that Kevin's death was the event that caused his dissociation from KBK, and they denied that Kevin's distributional interest in KBK passed to his estate upon his

3

death. As affirmative defenses, the defendants alleged that count I was barred by the applicable statute of limitations because Kevin was dissociated as a member of KBK on June 18, 2003, and any cause of action to contest his dissociation or to make a claim for his distributional interest in KBK ran on June 19, 2013. The defendants also claimed that count I was barred by *laches* because Kevin did not pursue a cause of action for nearly 17 years. As to count II, the defendants denied that there was an oral contract for deed or that Kevin made the payments as alleged under the purported oral contract for deed. As the affirmative defense to count II, the defendants asserted that the alleged oral contract for deed was unenforceable under section 2 of the statute of frauds (740 ILCS 80/2 (West 2020)).[2] In response, the plaintiff denied each of the affirmative defenses, and further asserted that the statute of frauds was not applicable to count II of the complaint.

¶ 8 A bench trial was held on November 20, 2023. The plaintiff called Ken as an adverse witness. The plaintiff also testified and offered documentary evidence. Ken testified in the defendants' case. In addition, the defendants presented the deposition testimony of their expert, Scott Hendricks, along with testimony from two of Ken's business acquaintances and additional documentary evidence. More than one thousand pages of documents, including bank statements, tax returns, leases, and other financial records, were offered at trial. An overview of the testimony and evidence relevant to each count of the complaint follows.

¶ 9 A. The Estate's Interest in KBK

¶ 10 KBK came into existence as a limited liability company when its articles of organization were filed with the Illinois Secretary of State on May 18, 2001. A copy of KBK's articles of organization was admitted into evidence. The articles-of-organization document was a standardized form containing check boxes and blank lines to be completed by the organizer of the

---

[2]The Frauds Act is commonly referred to as the statute of frauds. 740 ILCS 80/0.01 (West 2020).

limited liability company. KBK's articles of organization provided that the management of the company was vested in its members, Ken, Barbara, and Kevin. It further provided, "At least two members must execute documents and instruments for such documents and instruments to be valid and binding obligations of the LLC." Ken signed the document as the "organizer" of the company. Shortly after KBK formed, Kevin was made vice president of the company. Ken was president of the company and Barbara was secretary/treasurer.

¶ 11    On June 18, 2003, Ken filed articles of amendment to KBK's articles of organization with the Illinois Secretary of State. A copy of the articles of amendment was admitted into evidence. Like the articles of organization, the document was a standardized form with blank lines and check boxes. The signature line on the articles of amendment indicates that Ken signed the document on April 28, 2003. Paragraph 4 of the articles of amendment provided:

> "The Articles of Organization are amended as follows: (Attach a copy of the text of each amendment adopted.)
>
> * * *
>
>   x   c) Withdrawal of a member (give name below),
>
>   x   d) Change in the address of the office at which the records *** are kept (give new address, including county below.
>
> * * *"

In the space below paragraph 4, Kevin Hohlbaugh was named as the withdrawing member, and a new office address was listed. Despite the directions in paragraph 4, there is no indication that "a copy of the text of each amendment adopted" was attached to the articles of amendment. Paragraph 6 of the articles of amendment provided:

> "6. This amendment was adopted by the members. S. 5-25(4).        ☒ Yes ☐ No

5

Not less than minimum number of members so approved."

¶ 12    Ken testified that he and Barbara thought it was prudent to remove Kevin as a member of the company because Kevin and his wife were separated, and Kevin was not paying his bills. Ken admitted his intent in filing the amendment to KBK's articles of organization was to take away Kevin's ownership share in KBK. Ken also admitted saying that "he put [Kevin] in, so I can take him out." Ken thought that a majority of the members of a limited liability company could vote to remove another member. Ken testified that "the majority" removed Kevin. Ken believed that the filing of the articles of amendment made the dissociation valid. Ken also acknowledged that the members of KBK did not enter into a written operating agreement.

¶ 13    Ken testified that KBK had no assets in 2003. The company began to acquire assets in late 2008 or 2009. Ken stated that he and Barbara purchased a 700-acre farm in Wayne County, Illinois, in 2012, and they transferred the farmland to KBK in 2013. KBK then leased the farmland to tenant farmers. The written lease agreements were admitted into evidence. Although the leases contained recitations that the agreements were between the farmers and "Kenneth and Barbara Hohlbaugh," the signature blocks on these leases identified KBK as the lessor and contained the signature of "Kenneth D. Hohlbaugh, President." Ken testified that Kevin received a portion of the rental income from these farm leases. Based upon IRS 1099 tax forms issued to Kevin in the years 2013 through 2019, the tenant farmers made rental payments directly to Kevin. There were no payments from KBK to Kevin. KBK did not file tax returns.

¶ 14    Scott Hendricks, a certified public accountant and a licensed attorney, testified as an expert for the defendants. Hendricks opined that a majority of the members of a three-member limited liability company could remove one of its members. He further opined that the disassociation of a member could be effective even if the dissociation did not meet the requirements of the Act, noting

6

that dissociation was like a divorce in that a person cannot be forced to remain married. Hendricks testified that in the event a member was improperly dissociated, the member's remedy was to file an action for damages.

¶ 15                                  B. The Oral Contract for Deed

¶ 16    In 2001 or 2002, Ken and Barbara acquired the Greenup property. The Greenup property was a commercial property used in connection with a trucking business, Midwest Transport Incorporated (MTI). On April 14, 2014, Ken and Barbara entered into a written lease with the ownership of MTI. The lease term was five years, beginning on November 1, 2012, and ending October 31, 2017. Under the terms of the lease, MTI was to pay monthly rent in the sum of $5,650 to Kevin. On November 1, 2017, the lease was extended for an additional six years, with similar terms, including the payment of the monthly rent to Kevin.

¶ 17    The plaintiff testified that she, Kevin, Ken, and Barbara occasionally drove together to a specific restaurant in Clay City for a fish fry. During one trip to Clay City, the plaintiff heard Ken and Barbara talk about selling the Greenup property to Kevin on contract. Barbara presented a spreadsheet document that included the purchase price of the Greenup property and scheduled monthly payments of $2,000. The plaintiff could not recall the date of the discussion. She ran across the document sometime after the lawsuit was filed. The plaintiff moved to admit the document as evidence of the existence of the oral contract for deed. The defendants objected. After a lengthy discussion, the circuit court found that the plaintiff failed to authenticate or lay a proper foundation for the admission of the document and declined to admit it into evidence.

¶ 18    The plaintiff also offered an amortization table as evidence of the oral contract for the sale of the Greenup property. The amortization table was admitted into evidence. The amortization table was for a loan of $265,000, with a 13-year payout, with monthly payments of $2,000 at

7

2.250% interest. According to the table, the interest totaled $4,246.59 in 2017, $3,797.52 in 2018, and $3,338.26 in 2019.

¶ 19　The plaintiff testified that Kevin received a rent payment of $5,650 each month from MTI, and from that sum, Kevin made a monthly payment of $2,000 directly to Ken and Barbara. The plaintiff identified the tax returns that she and Kevin filed for the years 2013 through 2019. The tax returns show that Kevin and Amy reported the rent payments from the MTI lease as income. In addition, they took depreciation deductions for the Greenup property, showing its cost basis as $255,000 for the building and $10,000 for the land. Kevin's bank statements, including images of cleared checks, were introduced into evidence. The bank statements revealed that Kevin wrote 22 checks, each for $2,000, payable to Ken and Barbara, between July 15, 2013, and May 13, 2016. Many of the checks contained a notation, "mortgage," on the memo line. Kevin's bank statements also showed that Kevin wrote a $61,000 check, payable to Ken, dated July 4, 2018.

¶ 20　The plaintiff acknowledged that she and Kevin kept separate accounts during their marriage, and that Kevin kept his business dealings with his parents to himself. She also acknowledged that she and Kevin had separated a few times during their marriage, and the two were separated at the time of Kevin's death.

¶ 21　Ken and Barbara produced their individual tax returns for the years 2017, 2018, and 2019. Ken testified that he did not have copies of the tax returns for the prior years. According to the returns filed in the years 2017 through 2019, Ken and Barbara reported no income from the MTI lease, and they took no depreciation deductions for the Greenup building. Ken and Barbara reported interest income in a line item entitled, "Kevin Hohlbaugh-Contract Sale," on Schedule B of their tax returns. The reported interest income was $4,274 in 2017, $3,798 in 2018, and $3,339 in 2019. The interest payments were consistent with the amortization table. KBK's bank statements

8

indicate there were six $2,000 deposits and one $5,000 deposit from "KH" during the period from June 30, 2015, through October 31, 2017. Ken and Barbara produced bank statements for the period from April 15, 2016, through July 13, 2018. Those bank statements showed three separate deposits from "KH" for $20,000, $3,000, and $61,000.

¶ 22    Ken testified that the initials "KH" on the deposits slips appeared to refer to Kevin. Ken also testified that the $61,000 check was a repayment to Barbara and himself for roof repairs done on the Greenup property. Ken acknowledged that Kevin agreed to pay Ken and Barbara $2,000 per month from the $5,650 in rental income that Kevin received from the tenant. Ken testified there was no oral contract for the sale of the Greenup property to Kevin. Ken then reviewed the amortization table. He did not recognize it and did not know who prepared it. Ken noted that he and Barbara did not prepare their own tax returns. Their returns and the tax returns of Kevin and Amy were prepared by the same certified public accountant. Ken stated that the accountant was "very thorough."

¶ 23    A Peoples State Bank of Newton loan application dated June 8, 2018, was admitted into evidence. The application was submitted by Kevin, Ken, and Barbara. It requested a loan of $95,000 for "Building Improvements." In addition, a promissory note dated June 26, 2018, was admitted into evidence. The promissory note was for a loan of $95,000, with an interest rate of 4.230%. Although the note was signed by Kevin, Ken, and Barbara, as borrowers, it was Kevin's loan. Ken testified that Kevin used part of the loan to pay back Ken and Barbara for roof repairs on the Greenup building and part to purchase a truck. The loan was renewed in June 2019. Kevin made all loan payments until the date of his death.

¶ 24    The defendants called two witnesses to testify about the efforts of Ken and Barbara to provide income for Kevin. David Correll testified that he met Ken during the time when Correll

9

worked as an attorney for MTI. Correll recalled a conversation between he and Ken in late 2011 or 2012. Ken voiced concerns about his son's financial situation and wanted to augment his son's income. Ken wanted to assign rents to his son while maintaining the income-generating property for himself. Correll had no further conversations with Ken regarding that matter. Mark Ballard, an attorney who provided estate planning, testified that he was hired by Ken and Barbara to create a trust fund that would provide income to Kevin during Kevin's lifetime. Ballard did not know whether the trust was ever funded.

¶ 25    At the close of the proceedings, the circuit court took the case under advisement. On December 14, 2023, the circuit court issued a written judgment, containing the court's findings of fact, conclusions of law, and rulings. As to count I, the court determined that the plaintiff failed to establish that the Estate owned one-third of the membership interest in KBK. The court found that KBK had no written operating agreement and that there was no evidence of an oral operating agreement. The court rejected the plaintiff's argument that in the absence of an operating agreement, the provisions of section 35-45 of the Act controlled the dissociation of a member of a limited liability company. The court concluded that in the absence of terms for disassociating a member in an operating agreement, a member could be disassociated by majority vote of the other members. "To find otherwise would result in members being unable to break the LLC relationship until one member dies." The court also concluded that the improper dissociation of a member gives rise to a cause of action for damages as provided in section 15-20 of the Act (805 ILCS 180/15-20 (West 2022)).

¶ 26    As to count II, the circuit court found that the parties contemplated an agreement to sell the Greenup property for the sum of $265,000, payable over a term of 13 years, at a rate of 2.250% interest, with $2,000 in monthly installment payments. However, the court also found that the oral

10

agreement lacked many of the terms generally included in a contract for deed, such as a legal description of the real estate and specifications regarding what constituted a breach or a default and what remedies were available. The court concluded that the absence of contractual terms addressing breach, default, and remedies rendered the oral agreement "uncertain" and "unenforceable." The court further found that Kevin did not make all of the monthly payments due under the oral contract, and that specific performance was not available where the petitioning party had clearly defaulted. The court concluded that the plaintiff provided a significant amount of evidence that Kevin and Ken and Barbara intended an oral contract for deed, but she failed to meet her burden to establish an enforceable oral contract. The court entered a judgment in favor of the defendants and against the plaintiff on both counts of the complaint. This appeal followed.

¶ 27                                    II. ANALYSIS

¶ 28                        A. The Estate's Interest in KBK

¶ 29    In her first point on appeal, the plaintiff claims that the circuit court failed to properly consider and apply the requirements in section 35-45 of the Act (805 ILCS 180/35-45 (West 2020)), along with other sections of the Act relating to dissociation, and therefore erred in determining that Kevin was effectively disassociated as a member of KBK on June 18, 2003. This issue involves a question of statutory interpretation.

¶ 30    In interpreting the Act, we are guided by well-established principles of statutory interpretation. *Tillman v. Pritzker*, 2021 IL 126387, ¶ 17. The primary goal in interpreting a statute is to ascertain and give effect to the intent of the legislature. *Tillman*, 2021 IL 126387, ¶ 17; *Illinois Graphics Co. v. Nickum*, 159 Ill. 2d 469, 479 (1994). The best indicator of legislative intent is the language of the statute, given its plain and ordinary meaning. *Tillman*, 2021 IL 126387, ¶ 17. If the statutory language is clear and unambiguous, it should be applied as written, without resort to

11

other tools of interpretation. *Tillman*, 2021 IL 126387, ¶ 17. In construing a statute, it is never proper for a court to depart from the plain language by reading into a statute exceptions, limitations, or conditions that conflict with the clearly expressed legislative intent. *Illinois Graphics Co.*, 159 Ill. 2d at 479. An issue involving statutory interpretation presents a question of law that is reviewed *de novo*. *Tillman*, 2021 IL 126387, ¶ 17.

¶ 31    As noted, KBK is a member-managed limited liability company that came into existence when the company's articles of organization were filed with the Illinois Secretary of State on May 18, 2001. At that time, Kevin, Ken, and Barbara were the only members of the company. On June 18, 2003, Ken filed articles of amendment that purported to withdraw Kevin as a member of KBK. The defendants claim that Kevin was effectively withdrawn as a member on June 18, 2003, pursuant to the filing of the articles of amendment. The plaintiff disagrees, arguing that without an operating agreement addressing dissociation, the requirements for dissociation set forth in section 35-45 of the Act controlled. The plaintiff contends that because the defendants did not comply with those requirements, Kevin was not dissociated as a member of KBK in 2003. The plaintiff also contends that Ken could not unilaterally withdraw Kevin as a member of KBK by checking a box on the articles of amendment indicating the withdrawal of a member and filing the articles of amendment with the Illinois Secretary of State.

¶ 32    Generally, the provisions of the Act serve as default provisions that govern an Illinois limited liability company in the absence of controlling provisions in an operating agreement. See 805 ILCS 180/15-5(a) (West 2020).[3] Section 15-5 of the Act provides that all members of a limited liability company may enter into an operating agreement to regulate the affairs of the company,

---

[3]The pertinent provisions of the Limited Liability Company Act, as they existed in 2003, are textually the same or similar to the provisions as they exist today. Any differences in the current and former versions of the Act will be noted.

12

the conduct of the company's business, and the relationships, rights, and responsibilities of its members. 805 ILCS 180/15-5(a) (West 2020). Section 15-5 further provides, "To the extent the operating agreement does not otherwise provide, this Act governs relations among members, managers, and the company." 805 ILCS 180/15-5(a) (West 2020). It is undisputed that the members of KBK did not enter into a written operating agreement, and there is no evidence that they entered into an oral operating agreement. Consequently, the Act governs the relationships, rights, and responsibilities of the members of KBK, including the dissociation of a member. 805 ILCS 180/15-5(a) (West 2020).

¶ 33    Section 35-45 of the Act identifies specific events that resulted in a member's dissociation from a limited liability company under the Act. 805 ILCS 180/35-45 (West 2020). When the articles of amendment were filed in 2003, section 35-45 identified 11 events that could cause a member's dissociation. See 805 ILCS 180/35-45 (West 2002). This section was subsequently amended to include three additional events not relevant here. 805 ILCS 180/35-45 (West 2020). In addition, a member of a member-managed company could dissociate from a company at any time, rightfully or wrongfully. See 805 ILCS 180/35-45(1), 35-50(a) (West 2002).

¶ 34    In this case, there is no evidence that Kevin voluntarily removed himself or gave notice of his express will to withdraw as a member of KBK. Therefore, section 35-45(1) and section 35-50 are not applicable in this case. 805 ILCS 180/35-45(1), 35-50 (West 2002). Of the other events listed in section 35-45, the circuit court considered the following: (2) an event agreed to in the operating agreement as causing the member's dissociation; (4) the member's expulsion pursuant to the operating agreement; and (8) the member's death. 805 ILCS 180/35-45(2), (4), (8) (West 2002). The circuit court correctly concluded that since the members of KBK did not have an operating agreement, Kevin could not have been dissociated from membership pursuant to

13

subsections (2) and (4) of section 35-45 of the Act. 805 ILCS 180/35-45(2), (4) (West 2002). There is no dispute that Kevin died on April 21, 2020. Under a plain reading of section 35-45, Kevin was dissociated from KBK upon his death in April 2020. 805 ILCS 180/35-45(8) (West 2020).

¶ 35    Nevertheless, the defendants contend that Kevin's dissociation occurred with the filing of the articles of amendment on June 28, 2003. The defendants have not cited any statute or case law to support their contention. They rely only on the testimony of their expert witness, Scott Hendricks, who opined that the dissociation of a member could be effective even if the statutory requirements were not met. The circuit court found the expert's interpretation was "more likely," and determined that in the absence of terms for dissociating a member in an operating agreement, a member could be dissociated by a majority vote of the other members, and that if a dissociation was improper under the Act, the result was not "a nullity," but rather, gave rise to a cause of action for damages.

¶ 36    At the time of these events, the consent of all members of a member-managed company was required for an amendment to the company's articles of organization. 805 ILCS 180/15-1(c)(2) (West 2002). There is no evidence that all three members of KBK consented to the amendment of the articles of organization as required in the Act. Ken testified that he and Barbara agreed that Kevin should withdraw as a member, and that a majority agreed to the amendment. Ken also acknowledged saying that he made Kevin a member of KBK and that he could remove Kevin from membership. Barbara did not testify. Therefore, the evidence indicates that only two of three members agreed to amend the articles of organization.

¶ 37    The circuit court, however, determined that in the absence of terms for disassociating in an operating agreement, a member could be disassociated by majority vote of the other members. This determination is at odds with the provisions in section 35-45 of the Act. The circuit court

14

departed from the plain language of the Act by reading into it an exception or new event resulting in dissociation that was not included in the text of the statute, and this was error. *Illinois Graphics Co.*, 159 Ill. 2d at 479. In addition, the circuit court's concern that the members of a company would be "unable to break the LLC relationship until one member dies" is unfounded. Under the Act, members of a limited liability company have options for the dissociation of a member or dissolution of the company. For example, under specified circumstances, the company or a member could file an application for another member's expulsion by judicial determination. 805 ILCS 180/35-45(6) (West 2020). A member could also be expelled by unanimous vote of the other members under specified circumstances. 805 ILCS 180/35-45(5) (West 2020). And, a member could apply for a decree of judicial dissolution of the company. 805 ILCS 180/35-1(4) (West 2020). Finally, the members could have opted to enter into an operating agreement to regulate the affairs and conduct of the company and to govern the relationships among the members. 805 ILCS 180/15-5 (West 2020).

¶ 38    Given the failure of the members of KBK to comply with the statutory provisions governing amendments to the article of organization and the statutory provisions governing dissociation, the filing of the articles of amendment in June 2003 did not effectuate the dissociation of Kevin as a member of KBK. In keeping with the provisions of section 35-45, which are controlling, Kevin was dissociated from KBK on his death in April 2020, and not before. 805 ILCS 180/35-45(8) (West 2020).

¶ 39    Under the Act, a member is not a co-owner of and has no transferable interest in the property of a limited liability company. 805 ILCS 180/30-1(a) (West 2020). Instead, the member has a distributional interest in the company, and that interest is personal property that may be transferred. 805 ILCS 180/30-1(b) (West 2020). The Act directs that upon a member's

15

dissociation, the company must cause the member's distributional interest to be purchased, and the member's right to participate in the management and conduct of the company's business terminates. See 805 ILCS 180/35-55 (West 2020). Upon Kevin's death, his estate, as transferee, was entitled to receive the distributions to which Kevin would have been entitled. See 805 ILCS 180/30-5 (West 2020).

¶ 40    After reviewing the record, we find that the plaintiff met her burden to establish that the Estate is the transferee of Kevin's one-third distributional interest in KBK. The nature and amount of Kevin's distributional interest is beyond the scope of the declaratory judgment action, and we take no position on that matter. Accordingly, as to count I, the judgment of the circuit court is reversed, and the cause is remanded to the circuit court with directions to enter a judgment in favor of the plaintiff, declaring that the Estate of Kevin Lee Hohlbaugh is the transferee of Kevin's one-third distributional interest in KBK.

¶ 41                    B. The Oral Contract for Deed

¶ 42    Next, the plaintiff argues that the circuit court erred in entering a judgment in favor of the defendants as to count II. The plaintiff claims that the circuit court properly found the existence of an oral contract for deed to the Greenup property, but the court then went beyond the request for a declaration of the rights of the parties to find that Kevin was in default, and that the contract was unenforceable.

¶ 43    Section 2-701 of the Code of Civil Procedure provides, in pertinent part, that "[a] court may, in cases of actual controversy, make binding declarations of rights, having the force of final judgments" in certain matters, including "the construction of *** [a] contract or other written instrument." 735 ILCS 5/2-701(a) (West 2020). When reviewing the circuit court's decision to grant or deny declaratory relief, the standard of review depends upon the nature of the question

16

presented. *Oak Run Property Owners Ass'n v. Basta*, 2019 IL App (3d) 180687, ¶ 50. Legal determinations are subject to *de novo* review, while factual determinations are reviewed for an abuse of discretion. *Basta*, 2019 IL App (3d) 180687, ¶ 50. Abuse of discretion means clearly against logic, and so the question is not whether the appellate court agrees with the circuit court, but whether the circuit court acted arbitrarily, without employing conscientious judgment, or whether, in view of all the circumstances, the court exceeded the bounds of reason and ignored recognized principles of law so that substantial prejudice resulted. *Vincent v. Vits*, 208 Ill. App. 3d 1, 5 (1991).

¶ 44    The plaintiff initially claims the circuit court went beyond her request for a judgment declaring the existence and validity of the oral contract for deed. In so arguing, the plaintiff ignores her request that the circuit court "adjudicate and declare" the rights of the parties "as to the oral contract for deed and the validity thereof," the rights of the parties "as to legal and equitable title" to the Greenup property as a result of the oral for deed, and "for such other and further relief as the Court deems necessary and proper." In rendering declaratory relief, it is within the power of the circuit court to grant consequential relief, and the court should grant the relief that it finds necessary and proper to the determination of the controversy before it. *Vinyard v. Vaught*, 138 Ill. App. 3d 641, 645-46 (1985). Here, the circuit court was asked to determine and declare not only the rights of the parties as to the existence and validity of an oral contract for the sale of the Greenup property, but also the rights of the parties to the legal and equitable title to the Greenup property. The plaintiff's complaint raised questions regarding the validity and the enforceability of the oral contract for deed and both parties presented evidence and argument on those matters during the bench trial. Therefore, we do not find that the circuit court went beyond the matters raised in the plaintiff's complaint and prayer for relief.

¶ 45    Next, the plaintiff contends that the circuit court's judgment in favor of the defendants is against the manifest weight of the evidence. The plaintiff claims there was sufficient evidence to establish the existence of an oral contract for deed and that the statute of frauds did not prevent specific performance of the contract.

¶ 46    When a challenge is made to the sufficiency of the evidence following a bench trial, the standard of review is whether the judgment is against the manifest weight of the evidence. *Bruss v. Klein*, 210 Ill. App. 3d 72, 78 (1991). A judgment is against the manifest weight of the evidence only when the opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence presented. *Best v. Best*, 223 Ill. 2d 342, 350 (2006). Under the manifest weight standard, the reviewing court gives deference to the circuit court as the finder of fact because it is in the best position to observe the conduct and demeanor of the parties and witnesses. *Best*, 223 Ill. 2d at 350.

¶ 47    In its order, the circuit court found that the plaintiff had provided a significant amount of evidence that Kevin and Ken and Barbara intended an oral contract for the sale of the Greenup property for $265,000, over a term of 13 years, at a rate of 2.250% interest, with monthly payments of $2,000. The court found, however, that the oral agreement lacked many of the terms generally included in a contract for deed, such as provisions regarding what constitutes breach or default, and what remedies are available. The court concluded that the absence of contractual terms addressing breach, default, and remedies rendered the oral agreement "uncertain" and "unenforceable."

¶ 48    To form a valid contract, an offer must be definite as to its material terms or require such definite terms in the acceptance so that the promises and performances that are to be rendered by each party are reasonably certain. *Academy Chicago Publishers v. Cheever*, 144 Ill. 2d 24, 29

18

(1991). A meeting of the minds between the parties will occur where there has been assent to the same things in the same sense on all essential terms and conditions of the contract. *La Salle National Bank v. International Ltd.*, 129 Ill. App. 2d 381, 394 (1970). For a contract to be capable of enforcement, its terms and provisions must enable the court to ascertain what the parties have agreed to do. *Cheever*, 144 Ill. 2d at 29. The lack of nonessential details, however, will not render a contract unenforceable. *Rose v. Mavrakis*, 343 Ill. App. 3d 1086, 1091-1092 (2003).

¶ 49     In this case, there was evidence of a meeting of the minds on the material terms of the oral contract for the sale of the Greenup property. The oral contract had a specified purchase price, a fixed term for payment, a schedule of monthly payments, and a stated interest rate. The property was sufficiently identified and was known to the parties as the Greenup property. The terms and conditions of the oral contract were definite and enabled the court to determine what the parties agreed to do. *Rose*, 343 Ill. App. 3d at 1091. As with any contract, in the event one party fails to perform in accordance with the terms of their agreement, the aggrieved party may pursue available remedies for a breach of the contract. *Rose*, 343 Ill. App. 3d at 1093. Thus, the plaintiff established the elements of an oral contract for the purchase of the Greenup property.

¶ 50     An oral contract for the sale of land is generally unenforceable under the statute of frauds. *Phillips v. Britton*, 162 Ill. App. 3d 774, 781 (1987). Under the Illinois statute, "No action shall be brought to charge any person upon any contract for the sale of lands *** for a longer term than one year, unless such contract or some memorandum or note thereof shall be in writing, and signed by the party to be charged therewith ***." 740 ILCS 80/2 (West 2020). Illinois courts have long recognized that sufficient part performance of an oral contract to convey land may remove the transaction from the operation of the statute of frauds. *Britton*, 162 Ill. App. 3d at 781. Where one party to an oral contract has so far performed his part of the agreement that to allow the other party

19

to invoke the statute of frauds would be tantamount to a perpetration of a fraud, equity will intervene to enforce the contract. *Culbertson v. Carruthers*, 66 Ill. App. 3d 47, 52 (1978).

¶ 51   To remove an oral agreement from the statute of frauds under the doctrine of part performance, the court must find that the terms of the contract are clear, definite, and unequivocal, that the contract has been at least partially performed by the party seeking the remedy, and that the acts allegedly done in performance are positively attributable exclusively to the contract. *Intini v. Marino*, 112 Ill. App. 3d 252, 256 (1983); *Blaise v. Stein*, 75 Ill. App. 3d 793, 796 (1979). The elements must be established by clear, cogent, and convincing evidence. *Blaise*, 75 Ill. App. 3d at 796. The burden is upon the party seeking the application of equitable principles to defeat the interposition of the statute of frauds not only to establish the terms and conditions of the oral agreement but also to show that enforcement of the oral agreement is required to prevent fraud or injustice. *Conness v. Conness*, 94 Ill. App. 2d 281, 284 (1968). Even where an oral contract is shown to exist, the circuit court has discretion whether to grant specific performance, and its decision will not be disturbed. *Anderson v. Kohler*, 397 Ill. App. 3d 773, 786 (2009). It is well established that the granting of equitable relief is not a matter of right, but rests in sound judicial discretion to be determined from the facts and circumstances of each individual case. *Schiff v. Breitenbach*, 14 Ill. 2d 611, 615-16 (1958).

¶ 52   In this case, the plaintiff established the elements of an oral contract for the purchase of the Greenup property. The circuit court found that Kevin failed to consistently make his monthly $2,000 payments, and that it was not clear from the evidence presented that the payments alleged by the plaintiff were all payments due under the contract due to the irregular frequency and amounts. The court concluded that Kevin failed to meet the terms of the agreement that had been established by the evidence. The court also found that taking the evidence in a light most favorable

20

to the plaintiff, that between 2013 and 2019, Kevin paid as much as $145,000 to Ken and Barbara for the purchase of the Greenup property, and that $158,000 would have been due under the contract. The court further found that Kevin received $437,450 for rental income from the Greenup property during that same period. Under those circumstances, the court could not find that equity required the enforcement of the oral agreement was required to prevent an injustice to the plaintiff. After reviewing the record, we do not find that the circuit court abused its discretion in finding that the plaintiff failed to meet her burden to establish the existence of an enforceable oral contract for the sale of the Greenup property. Accordingly, the judgment as to count II is affirmed.

¶ 53    The plaintiff also argues that the circuit court improperly denied the plaintiff's objection to the admission of the evidence deposition of the defendants' expert, Scott Hendricks, because his opinion testimony was based upon alleged conversations between Ken and Kevin that were precluded by the Dead-Man's Act. The Dead-Man's Act provides: "In the trial of any action in which any party sues or defends as the representative of a deceased person ***, no adverse party or person directly interested in the action shall be allowed to testify on his or her own behalf to any conversation with the deceased *** or to any event which took place in the presence of the deceased ***." 735 ILCS 5/8-201 (West 2020). The Dead-Man's Act bars an interested party from testifying on his or her own behalf to conversations with the deceased or to events that took place in the presence of the deceased. *In re Estate of Goffinet*, 318 Ill. App. 3d 152, 156 (2001). A circuit court's evidentiary ruling is a matter of discretion and will not be reversed absent a clear abuse of discretion. *In re Estate of Hoover*, 155 Ill. 2d 402, 420 (1993). In its written order, the circuit court considered the objections that the plaintiff made during the expert's deposition. The court concluded that during the deposition, the plaintiff had objected to all of the expert opinions that would be barred at trial because of the Dead-Man's Act. The court sustained those objections and

21

did not consider them in rendering its judgment. The plaintiff has not identified any specific erroneous evidentiary rulings that affected the judgment. Accordingly, the plaintiff has failed to show that the circuit court abused its discretion in admitting the evidence deposition of the defendants' expert, and the point is without merit.

¶ 54 For the reasons stated, the judgment of the circuit court as to count I of the complaint is reversed as the plaintiff met her burden to establish that the Estate is the transferee of Kevin's distributional interest in KBK, and the cause is remanded for the entry of a declaratory judgment in favor of the plaintiff. The judgment as to count II is affirmed as the plaintiff failed to establish an enforceable oral contract for deed.

¶ 55 Affirmed in part and reversed in part; cause remanded with directions.